# PART I - GENERAL PROVISIONS

## SECTION 1.1
## DEFINITIONS OF FEHB TERMS (JAN 1996)

For purpose of this contract, the following definitions apply:

| | |
|---|---|
| FEHBP: | Federal Employees Health Benefits Program. |
| Enrollee: | The Federal employee, annuitant, former spouse, temporarily-covered former Federal employee or dependent, enrolled under this contract. |
| Member: | The Enrollee and/or an eligible dependent for benefit purposes, and sometimes referred to as subscriber. |
| Act: | The Federal Employees Health Benefits Act, as amended; chapter 89 of title 5, United States Code. |
| Regulations: | (1) The Federal Employees Health Benefits Regulations; part 890, title 5, Code of Federal Regulations, and (2) chapters 1 and 16 of title 48, Code of Federal Regulations. |
| Benefits: | Covered services or payment for covered services set forth in Appendix A, to which Members are entitled to the extent provided by this contract. |
| Carrier: | As defined by chapter 89 of title 5, United States Code, and may be used interchangeably with the term Contractor. |

## SECTION 1.2
## ENTIRE CONTRACT (JAN 1996)

(a) This document as described in the *Table of Contents* constitutes the entire contract between the parties. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this contract. All modifications to the contract must be made in writing by the duly authorized Contracting Officer.

(b) All statements concerning coverage or benefits made by OPM, the Carrier or by any individual covered under this policy shall be deemed representations and not warranties. No such statement shall convey or void any coverage, increase or reduce any benefits under this policy or be used in the prosecution of or defense of a claim under this policy unless it is contained in writing and a copy of the instrument containing the statement is or has been furnished to the Member or to the person making the claim.

## SECTION 1.3
## ORDER OF PRECEDENCE (JAN 1996)

Any inconsistency in this contract shall be resolved by giving precedence in the following descending order: The Act, the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract.

## SECTION 1.4
## INCORPORATION OF LAWS AND REGULATIONS (JAN 1996)

(a) The applicable provisions of (1) chapter 89 of title 5, United States Code; (2) OPM's regulations as contained in part 890, title 5, Code of Federal Regulations; and (3) chapters 1 and 16 of title 48, Code of Federal Regulations constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith.

(b) If the Regulations are changed in a manner which would increase the Carrier's liability under this contract, the change will be made effective for the contract period subsequent to the period in which the change is promulgated and, if the change is promulgated in November or December, the change will not be effective until the second contract year following the year in which the change is promulgated; unless (i) The Carrier

agrees to an earlier date or (ii) the change is ordered by the Contracting Officer pursuant to the *Changes--Fixed Price--ALTERNATE I* clause of the contract.

SECTION 1.5
RECORDS AND INFORMATION TO BE FURNISHED BY OPM (JAN 1996)

(a) The OPM shall maintain or cause to be maintained records from which may be determined the names and social security numbers of all Enrollees. Such information shall be furnished to the Carrier by the OPM, or other agencies of the Federal Government, at such times and in such form and detail as will enable the Carrier to maintain a currently accurate record of all Enrollees.

(b) The Carrier shall be entitled to rely on information furnished to it, as provided in subsection (a) of this Section, and the OPM agrees that any liabilities incurred under this contract in reliance upon such information shall be a valid charge against the contract. Errors or delays in keeping or reporting data relative to coverage shall not invalidate coverage which would otherwise be validly in force or shall not continue coverage which would otherwise be terminated but, upon discovery of such errors or delays, an equitable adjustment shall be made.

(c) Neither clerical error (whether by the OPM, by any other Government agency, or by the Carrier) in keeping any records pertaining to coverage under this contract, nor delays in making entries thereon, nor failure to make or account for any deduction of enrollment charges, shall invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated, but upon discovery of such error or delay or failure an equitable adjustment of premiums shall be made. If any relevant facts pertaining to any individual to whom coverage under this contract relates shall be found to have been misstated, and if such misstatement affects the existence or the amount or extent of coverage, the true facts shall be used in determining whether coverage is in force under the terms of this contract and in what amount or to what extent. Any claim payments made by the Carrier before any such adjustment or determination shall be a valid charge against this contract.

(d) OPM shall provide the Carrier, not less often than semi-annually, the number of Enrollees enrolled under the contract by payroll office. The Carrier shall at least annually reconcile its enrollment records with those provided by the Government.

SECTION 1.6
CONFIDENTIALITY OF RECORDS (JAN 1991)
(FEHBAR 1652.224-70)

(a) The Carrier shall use the personal data on employees and annuitants that is provided by agencies and OPM, including social security numbers, for only those routine uses stipulated for the data and published annually in the *Federal Register* as part of OPM's notice of systems of records.

(b) The Carrier shall also hold all medical records, and information relating thereto, of Federal subscribers confidential except as follows:

(1) As may be reasonably necessary for the administration of this contract;

(2) As authorized by the patient or his or her guardian;

(3) As disclosure is necessary to permit Government officials having authority to investigate and prosecute alleged civil or criminal actions;

(4) As necessary to audit the contract;

(5) As necessary to carry out the coordination of benefit provisions of this contract; and

(6) For bona fide medical research or educational purposes. Release of information for medical research or educational purposes shall be limited to aggregated information of a statistical nature that does not identify any individual by name, social security number, or any other identifier unique to an individual.

(c) If the Carrier uses medical records for the administration of the contract, or for bona fide research or educational purposes, it shall so state in the Plan's brochure.

SECTION 1.7
STATISTICS AND SPECIAL STUDIES (JAN 1996)

(a) The Carrier shall maintain or cause to be maintained statistical records of its operations under the contract and shall furnish OPM, in the form prescribed by the Contracting Officer, the statistical reports reasonably necessary for the OPM to carry out its functions under Section 1308 and Chapter 89 of title 5, United States Code.

(b) The Carrier shall furnish such other reasonable statistical data and reports of special studies as the Contracting Officer may from time to time request for the purpose of carrying out its functions under Chapter 89 of title 5, United States Code.

(c) The Carrier shall furnish the routine reports in the number of copies to the addresses specified in Appendix C, *Contract Administration Data.*

SECTION 1.8
NOTICE (JAN 1991)

Where the contract requires that notice be given to the other party, such notice shall be given in writing to the address specified in Appendix C, *Contract Administration Data.*

SECTION 1.9
FEHB QUALITY ASSURANCE (JAN 1996)

(a) The Carrier shall develop and apply a quality assurance program specifying procedures for assuring contract quality. At a minimum the program must include procedures to address:

(1) Accuracy of Payments.

(i) Processing Accuracy - the number of FEHB claims processed accurately divided by the total number of FEHB claims processed for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 95 percent of FEHB claims must be processed accurately.

(ii) COB Processing - the Carrier must demonstrate that a statistically valid sampling technique is routinely used to identify FEHB claims prior to or after processing that require(d) coordination of benefits (COB) with a third party payer. As an alternative, the Carrier may provide evidence that it pursues all claims for COB.

(2) Timeliness of Payments to Members or Providers

(i) Average Processing Time (All FEHB Claims) - the average number of working days from the date an FEHB claim is received to the date it is adjudicated (paid, denied or a request for further information is sent out), for the given time period, expressed as a cumulative percentage.

REQUIRED STANDARD:

(A) An average of 60 percent of FEHB claims received over the given time period are adjudicated within 20 working days (28 calendar days).

(B) An average of 80 percent of FEHB claims received over the given time period are adjudicated within 30 working days (42 calendar days).

(C) An average of 95 percent of FEHB claims received over the given time period are adjudicated within 60 working days (84 calendar days).

(3) Quality of Services and Responsiveness to Members

(i) Member Inquiries - the number of working days taken to respond to an FEHB member's written inquiry, expressed as a cumulative percentage.

REQUIRED STANDARD:

(A) An average of 60 percent of FEHB member written inquiries are responded to within 10 working days (14 calendar days).

(B) An average of 90 percent of FEHB member written inquiries are responded to within 30 working days (42 calendar days).

(ii) Telephone Access - the Carrier shall report on the following statistics concerning telephone access to the member services department (or its equivalent) for the given time period. *Except that,* if the Carrier does not have a computerized phone system, report results of periodic surveys on telephone access.

(A) Telephone Waiting Time - the average

number of seconds elapsed before a member's telephone call is connected to a Carrier representative.

REQUIRED STANDARD: On average, no more than 1.5 minutes elapse before a member's telephone call is connected to a Carrier representative.

(B) Telephone Blockage Rate - the percentage of time that callers receive a busy signal when calling the Carrier.

REQUIRED STANDARD: On average, callers receive a busy signal no more than 10 percent of the time.

(C) Telephone Abandonment Rate - the number of calls attempted but not completed (presumably because callers tired of waiting to be connected to a Carrier representative) divided by the total number of calls attempted (both completed and not completed), expressed as a percentage.

REQUIRED STANDARD: On average, no more than 8 percent of calls are abandoned.

(4) Responsiveness to FEHB Member Requests for Reconsideration.

REQUIRED STANDARD: For 100 percent of written FEHB disputed claim requests received for the given time period, within 30 days after receipt by the Carrier, the Carrier must affirm the denial in writing to the FEHB member, pay the claim, provide the service, or request additional information reasonably necessary to make a determination.

(5) Quality Assurance Plan - the Carrier must demonstrate that a statistically valid sampling technique is routinely used prior to or after processing to randomly sample FEHB claims against Carrier quality assurance/fraud and abuse prevention standards.

(6) Physician Credentialing - the Carrier must demonstrate that it requires the following credential checks of all of its physicians, both during the initial hiring process and during periodic re-credentialing. As an alternative, the Carrier may demonstrate that the following credential checks are performed by a secondary source, such as a hospital.

(A) Verification of medical school graduation records.

(B) Routine check with local and/or state medical societies and/or boards.

(C) Routine check of the Department of Health and Human Services (DHHS) list of debarred providers.

(D) Routine check of the National Practitioner Data Bank.

(7) Appointments - All prepaid carriers must meet the following standards for the given time period. *Except that,* if this information is not routinely collected, report results from periodic surveys.

REQUIRED STANDARD:

(i) Urgent appointments are available, on average, within 24 hours of an authorized request for one.

(ii) Routine appointments are available, on average, within 1 month of an authorized request for one.

(iii) Average office waiting times - on average, members who arrive on time for a scheduled appointment wait no more than 30 minutes before they are seen by the provider of the medical service.

*(NOTE: For the purpose of this standard (7), a simplified classification system is used in which all appointments are classified as either emergency, urgent or routine. Emergency appointments must be seen immediately to prevent health deterioration. Urgent appointments are those for the sudden, acute onset of symptoms that must be seen within 1 (one) day to prevent health deterioration. All other appointments are considered routine.)*

(b) The Carrier shall keep complete records of its quality assurance procedures and the results of their implementation and make them available to the Government as determined by OPM. If the Carrier cannot separate FEHB claims from all other claims, the Carrier may report compliance based on all claims and indicate this on the report.

(c) The Contracting Officer may order the correction of a deficiency in the Carrier's quality assurance program. The Carrier shall take the necessary action promptly to implement the Contracting Officer's order.

(d) Assessing Member Satisfaction. In addition to any other means of surveying Plan members that the Carrier may develop, the Carrier shall participate in a uniform customer

satisfaction survey as directed by OPM, to permit comparisons across FEHB carriers. The Carrier shall take into account the published results of the uniform survey, or other results as directed by OPM, in identifying areas for improvement as part of the Carrier's quality assurance program.

SECTION 1.10
NOTICE OF SIGNIFICANT EVENTS (JAN 1991) (FEHBAR 1652.222-70)

(a) The Carrier agrees to notify the Contracting Officer of any Significant Event within ten (10) working days after the Carrier becomes aware of it. As used in this section, a Significant Event is any occurrence or anticipated occurrence that might reasonably be expected to have a material effect upon the Carrier's ability to meet its obligations under this contract, including, but not limited to, any of the following:

(1) Disposal of major assets;

(2) Loss of 15% or more of the Carrier's overall membership;

(3) Termination or modification of any contract or subcontract if such termination or modification might have a material effect on the Carrier's obligations under this contract;

(4) Addition or termination of provider agreements;

(5) Any changes in underwriters, reinsurers or participating plans;

(6) The imposition of, or notice of the intent to impose, a receivership, conservatorship, or special regulatory monitoring;

(7) The withdrawal of, or notice of intent to withdraw State licensing, HHS qualification, or any other status under Federal or State law;

(8) Default on a loan or other financial obligation;

(9) Any actual or potential labor dispute that delays or threatens to delay timely performance or substantially impairs the functioning of the Carrier's facilities or facilities used by the Carrier in the performance of the contract;

(10) Any change in its charter, constitution, or by-laws which affects any provision of this contract or the Carrier's participation in the Federal Employees Health Benefits Program;

(11) Any significant changes in policies and procedures or interpretations of the contract or brochure which would affect the benefits available under the contract or the costs charged to the contract;

(12) Any fraud, embezzlement or misappropriation of FEHB funds; or

(13) Any written exceptions, reservations or qualifications expressed by the independent accounting firm (which ascribes to the standards of the American Institute of Certified Public Accountants) contracted with by the Carrier to provide an opinion on its annual financial statements.

(b) Upon learning of a Significant Event OPM may institute action, in proportion to the seriousness of the event, to protect the interest of Members, including, but not limited to--

(1) Directing the Carrier to take corrective action;

(2) Suspending new enrollments under this contract;

(3) Advising Enrollees of the Significant Event and providing them an opportunity to transfer to another plan;

(4) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account;

(5) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by he Significant Event; or

(6) Terminating this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (b) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall insert this clause in any subcontract or subcontract modification if both the amount of the subcontract or modification charged to the FEHBP (or, in the case of a community-rated carrier, applicable to the FEHBP) exceeds $100,000 and the amount of the subcontract or modification to

be charged to the FEHBP (or, in the case of a community-rated carrier, applicable to the FEHBP) exceeds 25 percent of the total cost of the subcontract or modification. If the Carrier is a CMP, it shall also insert this clause in all provider agreements over $25,000. If the Carrier is not a CMP, it shall also insert this clause in the contract with its underwriter, if any. The Carrier shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.11
FEHB INSPECTION (JAN 1991) (FEHBAR 1652.246-70)

(a) The Government or its agent has the right to inspect and evaluate the work performed or being performed under the contract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work. If the Government or its agent performs inspection or evaluation on the premises of the Carrier or a subcontractor, the Carrier shall furnish and require the subcontractor to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

(b) The Carrier shall insert this clause in all subcontracts for underwriting and administrative services and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.12
CORRECTION OF DEFICIENCIES (JAN 1996)

(a) The Carrier shall maintain sufficient financial resources, facilities, providers, staff and other necessary resources to meet its obligations under this contract. If the OPM determines that the Carrier does not demonstrate the ability to meet its obligations under this contract, the OPM may notify the Carrier of the asserted deficiencies. The Carrier agrees that, within ten (10) working days following notification, it shall present detailed plans for correcting the deficiencies. These plans shall be presented in a form prescribed by the OPM. Pending submission or implementation of plans required under this Section, the OPM may institute action as it deems necessary to protect the interests of Members, including, but not limited to:

(1) Suspending new enrollments under this contract;

(2) Advising Enrollees of the asserted deficiencies and providing them an opportunity to transfer to another plan;

(3) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account; or

(4) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the deficiency.

(b) The Carrier agrees that failure to submit or to diligently implement plans which are required under this Section shall constitute sufficient grounds for termination of this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (a) the OPM shall notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall include the substance of this clause in the contract with its underwriter and substitute an appropriate term for "Carrier."

SECTION 1.13
INFORMATION AND MARKETING MATERIALS (JAN 1996)

(a) OPM and the Carrier shall agree upon language setting forth the benefits, exclusions and other language of the Plan and shall certify to that language in the Certified Brochure Text (Appendix A of this contract). OPM, in its sole discretion, may order the Carrier to print and distribute the Certified Brochure Text, in a format and quantity approved by OPM. This formatted document is referred to as the FEHB brochure. The Carrier shall distribute the FEHB brochure to all Federal employees, annuitants, former spouses and former employees and dependents enrolled in the Plan. The Carrier shall also distribute the document(s) to

Federal agencies to be made available to such individuals who are eligible to enroll under this contract. The Carrier may print additional FEHB brochures for distribution or its own use, but only in the approved format and at its own expense.

(b) Supplemental material. Only marketing materials or other supplemental literature prepared in accordance with FEHBAR 1652.203-70 (Section 1.14 of this contract) may be distributed or displayed at or through Federal facilities.

(c) Carrier certifications. The Carrier shall certify to OPM each year that the statement of FEHB benefits in the Certified Brochure Text included as Appendix A, is reflected, verbatim, in the FEHB brochure and, if the Carrier intends to have supplemental marketing materials distributed by Federal agencies, that the materials have been prepared in accordance with FEHBAR 1652.203-70.

(d) OPM may order the Carrier to prepare an addendum or reissue the FEHB brochure or any piece(s) of supplemental marketing material at no expense to the Government if it does not conform to the certifications described in paragraph (c) of this section.

SECTION 1.14
MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (JAN 1991)(FEHBAR 1652.203-70)

(a) The Carrier agrees that any advertising material, including that labeled promotional material, marketing material, or supplemental literature, shall be truthful and not misleading.

(b) Criteria to assess compliance with paragraph (a) of this clause are available in the *FEHB Supplemental Literature Guidelines* which are developed by OPM and should be used, along with the additional guidelines set forth in FEHBAR 1603.702, as the primary guide in preparing material; further guidance is provided in the NAIC *Rules Governing Advertising of Accident and Sickness Insurance With Interpretive Guidelines.* Guidelines are periodically updated and provided to the Carrier by OPM.

(c) Failure to conform to paragraph (a) of this clause may result in a reduction in the service charge, if appropriate, and corrective action to protect the interest of Federal Members. Corrective action will be appropriate to the circumstances and may include, but is not limited to the following actions by OPM:

(1) Directing the Carrier to cease and desist distribution, publication, or broadcast of the material;

(2) Directing the Carrier to issue corrections at the Carrier's expense and in the same manner and media as the original material was made; and

(3) Directing the Carrier to provide, at the Carrier's expense, the correction in writing by certified mail to all enrollees of the Plan(s) that had been the subject of the original material.

(d) Egregious or repeated offenses may result in the following action by OPM:

(1) Suspending new enrollments in the Carrier's Plan(s);

(2) Providing Enrollees an opportunity to transfer to another plan; and

(3) Terminating the contract in accordance with Section 1.15, *Renewal and Withdrawal of Approval.*

(e) Prior to taking action as described in paragraphs (c) and (d) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(f) The Carrier shall incorporate this clause in subcontracts with its underwriter, if any, and other subcontractors directly involved in the preparation or distribution of such advertising material and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.15
RENEWAL AND WITHDRAWAL OF APPROVAL (JAN 1991) (FEHBAR 1652.249-70)

(a) The contract renews automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by OPM or the Carrier not less than 60 calendar days before the renewal date, or

unless modified by mutual agreement.

(b) This contract also may be terminated at other times by order of OPM pursuant to 5 U.S.C. 8902(e). After OPM notifies the Carrier of its intent to terminate the contract, OPM may take action as it deems necessary to protect the interests of Members, including but not limited to--

(1) Suspending new enrollments under the contract;

(2) Advising Enrollees of the asserted deficiencies; and

(3) Providing Enrollees an opportunity to transfer to another plan.

(c) OPM may, after proper notice, terminate the contract at the end of the contract term if it finds that the Carrier did not have at least 300 Enrollees enrolled in its Plan at any time during the two preceding contract terms.

SECTION 1.16
SUBCONTRACTS (JAN 1991) (FEHBAR 1652.244-70)

(a) The Carrier shall notify the Contracting Officer reasonably in advance of entering into any subcontract or subcontract modification, or as otherwise specified by this contract, if both the amount of the subcontract or modification charged to the FEHB Program (in the case of community-rated carriers, applicable to the FEHB Program) exceeds $100,000 and is 25 percent of the total cost of the subcontract.

(b) The advance notification required by paragraph (a) of this clause shall include the information specified below:

(1) A description of the supplies or services to be subcontracted;

(2) Identification of the type of subcontract to be used;

(3) Identification of the proposed subcontract and an explanation of why and how the proposed subcontractor was selected, including the competition obtained;

(4) The proposed subcontract price and the Carrier's cost or price analysis;

(5) The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions;

(6) The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract; and

(7) A negotiation memorandum reflecting--

(i) The principal elements of the subcontract price negotiations;

(ii) The most significant consideration controlling establishment of initial or revised prices;

(iii) The reason cost or pricing data were or were not required;

(iv) The extent, if any, to which the Carrier did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(v) The extent to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Carrier and the subcontractor; and the effect of any such defective data on the total price negotiated;

(vi) The reasons for any significant difference between the Carrier's price objective and the price negotiated; and

(vii) A complete explanation of the incentive fee or profit plan when incentives are used. The explanation shall identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

(c) The Carrier shall obtain the Contracting Officer's written consent before placing any subcontract for which advance notification is required under paragraph (a) of this clause. However, the Contracting Officer may ratify in writing any such subcontract. Ratification shall constitute the consent of the Contracting Officer.

(d) The Contracting Officer may waive the requirement for advance notification and consent required by paragraphs (a), (b) and (c) of this clause where the Carrier and subcontractor submit an application or

renewal as a contractor team arrangement as defined in FAR Subpart 9.6 and--

(1) The Contracting Officer evaluated the arrangement during negotiation of the contract or contract renewal; and

(2) The subcontractor's price and/or costs were included in the Plan's rates that were reviewed and approved by the Contracting Officer during negotiation of the contract or contract renewal.

(e) Unless the consent or approval specifically provides otherwise, consent by the Contracting Officer to any subcontract shall not constitute a determination (1) of the acceptability of any subcontract terms or conditions; (2) of the allowability of any cost under this contract; or (3) to relieve the Carrier of any responsibility for performing this contract.

(f) No subcontract placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis. Any fee payable under cost reimbursement type subcontracts shall not exceed the fee limitations in FAR 15.903(d). Any profit or fee payable under a subcontract shall be in accordance with the provision of Section 3.7, *Service Charge.*

(g) The Carrier shall give the Contracting Officer immediate written notice of any action or suit filed and prompt notice of any claim made against the Carrier by any subcontractor or vendor that, in the opinion of the Carrier, may result in litigation related in any way to this contract with respect to which the Carrier may be entitled to reimbursement from the Government.

*[NOTE: Paragraph (f) of this FEHBAR clause is not applicable to this community rated contract and is replaced as follows: (f) No subcontract placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis. Any fee payable under cost reimbursement type subcontracts shall not exceed the fee limitations in FAR 15.903(d).]*

SECTION 1.17
NOVATION AGREEMENT (JAN 1996)

The agreement at FEHBAR 1642.1204 shall be submitted for approval to OPM when the Carrier's assets or the entire portion of the assets pertinent to the performance of this contract, as determined by the Government, are transferred.

SECTION 1.18
AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (JAN 1996)

The agreement at FEHBAR 1642.1205 shall be submitted for approval to OPM when the carrier changes its name and the Government's and Contractor's rights and obligations remain unaffected.

## PART II - BENEFITS

### SECTION 2.1
### ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT (JAN 1996)

(a) Enrollment.

(1) Each eligible individual who wishes to be enrolled in the plan offered by this Carrier shall, as a prerequisite to such enrollment, complete a Health Benefits Registration Form within the time and under the conditions specified in the regulations. The Government personnel office having cognizance over the Enrollee shall promptly furnish notification of such registration to the Carrier.

(2) A person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or directions of OPM given pursuant to chapter 89, title 5, United States Code.

(b) The Carrier shall, subject to the approval of the Contracting Officer, define an enrollment area. The Carrier may limit enrollment to individuals residing inside the approved enrollment area.

(c) The Carrier shall issue evidence of the Enrollee's coverage and furnish to the Enrollee copies of any claim forms as necessary.

### SECTION 2.2
### BENEFITS PROVIDED (JAN 1996)

(a) The Carrier shall provide the benefits as described in the Certified Brochure Text found in Appendix A.

(1) Benefits offered under this contract may be modified by the Carrier to permit methods of treatment not expressly provided for, but not prohibited by law, rule or Federal policy, if otherwise contractually appropriate, and if such treatment is medically necessary and is as cost effective as providing benefits to which the Member may otherwise be entitled.

(2) The Carrier may pay for or provide a health service or supply in an individual case which does not come within the specific benefit provisions of the contract, if the Carrier determines the benefit is within the intent of the contract, and the Carrier determines that the provision of such benefit is in the best interests of the Federal Employees Health Benefits Program.

(3) In individual cases, the Carrier, after consultation with and concurrence by the Member and provider(s), may offer a benefit alternative not ordinarily covered under this contract which will result in equally effective medical treatment at no greater cost. The decision to offer an alternative benefit is solely the Carrier's and is not subject to OPM review under the disputed claims process.

(b) In each case when the Carrier provides a benefit in accordance with the authority of (a)(1), (2) or (3) the Carrier shall document in writing prior to the provision of such benefit the reasons and justification for its determination. Such payment or provision of services or supplies shall not be considered to be a precedent in the disposition of similar cases.

(c) Except as provided for in (a) above, the Carrier shall provide benefits for services or supplies in accordance with Appendix A.

(d) The Carrier, subject to (e) below, shall determine whether in their judgment a service or supply is medically necessary or payable under this contract.

(e) The Carrier agrees to pay for or provide a health service or supply in an individual case if OPM finds that the Member is entitled thereto under the terms of the contract.

### SECTION 2.3
### PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES (JAN 1996)

(a) By enrolling or accepting services under this contract, Members are obligated to all terms, conditions, and provisions of this

contract. The Carrier may request Members to complete reasonable forms or provide information which the Carrier may reasonably request; *provided*, however, that the Carrier shall not require Members to complete any form as a precondition of receiving benefits unless the form has first been approved for use by OPM. Notwithstanding Section 2.11 *Claims Processing,* forms requiring specific approval do not include claim forms and other forms necessary to receive payment of individual claims.

(b) When members are required to file claims for covered benefits, benefits shall be paid (with appropriate documentation of payment) within a reasonable time after receipt of reasonable proof covering the occurrence, character, and extent of the event for which the claim is made. The claimant shall furnish satisfactory evidence that all services or supplies for which expenses are claimed are covered services or supplies within the meaning of the contract.

(c) The procedures and time period for receiving benefits and filing claims shall be as specified in the Certified Brochure Text *(Appendix A)*. However, failure to file a claim within the time required shall not in itself invalidate or reduce any claim where timely filing was prevented by administrative operations of Government or legal incapacitation, provided the claim was submitted as soon as reasonably possible.

(d) The Carrier may request a Member to submit to one or more medical examinations to determine whether benefits applied for are for services and supplies necessary for the diagnosis or treatment of an illness or injury or covered condition. The examinations shall be made at the expense of the Carrier.

(e) As a condition precedent to the provision of benefits hereunder, the Carrier, to the extent reasonable and necessary and consistent with Federal law, shall be entitled to obtain from any person, organization or Government agency, including the Office of Personnel Management, all information and records relating to visits or examination of, or treatment rendered or supplies furnished to, a Member as the Carrier requires in the administration of such benefits. The Carrier may obtain from any insurance company or other organization or person any information, with respect to any Member, which it has determined is reasonably necessary to:

(1) identify enrollment in a plan,

(2) verify eligibility for payment of a claim for health benefits, and

(3) carry out the provisions of the contract, such as subrogation, recovery of payments made in error, workers compensation, and coordination of benefits.

(f) When claim filing is required, benefits are payable to the Enrollee in the Plan or his or her assignees. However, under the following circumstances different payment arrangements are allowed:

(1) Reimbursement Payments for the Enrollee. If benefits become payable to the estate of an Enrollee or an Enrollee is a minor, or an Enrollee is physically or mentally not competent to give a valid release, the Carrier may either pay such benefits directly to a hospital or other provider of services or pay such benefits to any relative by blood or connection by marriage of the Enrollee determined by the Carrier to be equitably entitled thereto.

(2) Reimbursement Payments for a minor child. If a child is covered as a family member under the Enrollee's self and family enrollment and is in the custody of a person other than the Enrollee, and if that other person certifies to the Carrier that he or she has custody of and financial responsibility for the dependent child, then the Carrier may issue an identification card for the dependent child(ren) to that person and, when claim filing is required, may reimburse that person for any covered medical service or supply.

(3) Reimbursement Payments to family members covered under the Enrollee's self and family enrollment. If a covered child is legally responsible, or if a covered spouse is legally separated, and if the covered person does not reside with the Enrollee and certifies such conditions to the Carrier, then the Carrier may issue an identification card to the person and when claim filing is required, the Carrier may reimburse that person for any covered

medical service or supply.

(4) Any payments made in good faith in accordance with paragraphs (f)(1) through (f)(3) shall fully discharge the Carrier to the extent of such payment.

(g) Overpayments. If the Carrier or OPM determines that a Member's claim has been paid in error for any reason, the Carrier shall make a diligent effort to recover an overpayment to the member from the member or, if to the provider, from the provider. Diligent effort to recover overpayments means that upon discovering that an overpayment exists, the Carrier shall--

(1) Send a written notice of overpayment to the member or provider that provides: (A) an explanation of when and how the overpayment occurred, (B) when applicable, cite the appropriate contractual benefit provision, (C) the exact identifying information (i.e., dollar amount overpaid, date paid, check number, date of service and provider name), (D) a request for payment of the debt in full, and (E) an explanation of what may occur should the debt not be paid, including possible offset to future benefits. The notice may also offer an installment option. In addition, the Carrier shall provide the debtor with an opportunity to dispute the existence and amount of the debt before proceeding with collection activities;

(2) After confirming that the debt does exist and in the appropriate amount, send follow-up notices to the member or the provider at 30, 60 and 90 day intervals, if the debt remains unpaid and undisputed;

(3) The Carrier may off-set future benefits payable to the member or to a provider on behalf of the member to satisfy a debt due under the FEHBP if the debt remains unpaid and undisputed for 120 days after the first notice.

(4) After applying the first three steps, refer cases to a collection attorney or a collection agency if the debt is not recovered;

(5) Make diligent effort to recover overpayments until the debt is paid in full or determined to be uncollectible by the Carrier because it is no longer cost effective to pursue further collection efforts or it would be against equity and good conscience to continue collection efforts.

(6) Suspend recovery efforts for a debt which is based upon a claim that has been appealed as a disputed claim under Section 2.8, until the appeal has been resolved;

(7) Maintain records that document individual unrecovered overpayment collection activities for audit or future reference.

SECTION 2.4
TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES (JAN 1996)

(a) A Member's coverage is terminated as specified in regulations issued by the OPM. Benefits after termination of coverage are as specified in the regulations.

(b) A Member is entitled to a temporary continuation of coverage or an extension of coverage under the conditions and to the extent specified in the regulations.

(c) A Member whose coverage hereunder has terminated is entitled, upon application within the times and under the conditions specified in regulations, to a non-group contract regularly offered for the purpose of conversion from the contract or similar contracts. The conversion contract shall be in compliance with 5 U.S.C., chapter 89, and regulations issued thereunder.

(d) Costs associated with writing or providing benefits under conversion contracts shall not be an allowable cost of this contract.

(e) The Carrier shall maintain on file with OPM copies of the conversion policies offered to persons whose coverage under this contract terminates and advise OPM promptly of any changes in the policies. The Contracting Officer may waive this requirement where because of the large number of different conversion policies offered by the Carrier it would be impractical to maintain a complete up-to-date file of all policies. In this case the Carrier shall submit a representative sample of the general types of policies offered and provide copies of specific policies on demand.

SECTION 2.5
SUBROGATION (JAN 1996)

(a) The Carrier shall subrogate FEHB claims in the same manner in which it subrogates claims for non-FEHB members, according to the following rules:

(1) The Carrier shall subrogate FEHB claims if it is doing business in a State in which subrogation is permitted, and in which the Carrier subrogates for non-FEHB members;

(2) The Carrier shall subrogate FEHB claims if it is doing business in a State in which subrogation is prohibited, but in which the Carrier subrogates for at least one plan covered under the Employee Retirement Income Security Act of 1974 (ERISA);

(3) The Carrier shall not subrogate if it is doing business in a State that prohibits subrogation, and in which the Carrier does not subrogate for any plan covered under ERISA;

(4) For Carriers doing business in more than one State, the Carrier shall apply the rules in (1) through (3) of this subsection according to the rule applicable to the State in which the subrogation would take place.

(b) The Carrier's subrogation procedures and policies shall be shown in the Certified Brochure Text.

SECTION 2.6
COORDINATION OF BENEFITS (JAN 1991) (FEHBAR 1652.204-71)

(a) The Carrier shall coordinate the payment of benefits under this contract with the payment of benefits under Medicare, other group health benefits coverages, and the payment of medical and hospital costs under no-fault or other automobile insurance that pays benefits without regard to fault.

(b) The Carrier shall not pay benefits under this contract until it has determined whether it is the primary carrier or unless permitted to do so by the Contracting Officer.

(c) In coordinating benefits between plans, the Carrier shall follow the order of precedence established by the NAIC Model Guidelines for Coordination of Benefits (COB) as specified by OPM.

(d) Where (1) the Carrier makes payments under this contract which are subject to COB provisions; (2) the payments are erroneous, not in accordance with the terms of the contract, or in excess of the limitations applicable under this contract; and (3) the Carrier is unable to recover such COB overpayments from the Member or the providers of services or supplies, the Contracting Officer may allow such amounts to be charged to the contract; the Carrier must be prepared to demonstrate that it has made a diligent effort to recover such COB overpayments.

(e) COB savings shall be reported by experience-rated carriers each year along with the Carrier's annual accounting statement in a form specified by OPM.

(f) Changes in the order of precedence established by the NAIC Model Guidelines implemented after January 1 of any given year shall be required no earlier than the beginning of the following contract term.

*[NOTE: Subsection 2.6(b) will not be applied to this community-rated plan. When there is double coverage for covered benefits, other than emergency services from non-Plan providers, the prepaid plan Carrier will continue to provide benefits in full, but will seek payment for the services and supplies provided, to the extent that the services and supplies are covered by the other coverage, no-fault automobile insurance or other primary plan. Likewise, Subsection 2.6(d) is not applicable to community-rated plans.]*

SECTION 2.7
DEBARMENT AND OTHER SANCTIONS (JAN 1996)

(a) Notwithstanding 5 U.S.C. 8902(j) or any other provision of the law and regulations, if, under 5 U.S.C. 8902a, 5 C.F.R. 970, or Public Law 103-123 (or other applicable appropriations law), a provider is barred from participating in the Program under 5 U.S.C. or the provider's services under 5 U.S.C. are excluded, the Carrier agrees that no payment

shall be made by the Carrier pursuant to any contract under 5 U.S.C. (either to such provider or by reimbursement) for any service or supply furnished by such provider during the period of the debarment, except as provided in 5 C.F.R. 970.210(b).

(b) The OPM shall notify the Carrier when a provider is barred from the FEHBP.

SECTION 2.8
FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS (JAN 1996)

The processes for filing health benefit claims and for court review of disputed health benefit claims under the FEHB are as described at FEHBAR 1652.204-72.

SECTION 2.9
PROTECTION OF MEMBERS AGAINST PROVIDER CLAIMS (JAN 1996)

(a) The Carrier shall provide the Contracting Officer with evidence that its contracts with providers (hospitals and physicians) contain a provision that, in the event of Carrier insolvency, or inability to pay expenses for any reason, the providers shall not look to Members for payment. The Carrier agrees that over 90 percent of the total benefit cost under this contract will be provided under such contracts with providers; or

(b) In lieu of subsection (a) above, the Contracting Officer may accept such other combinations of coverage which provide protection of Members against provider claims as defined in the NAIC (National Association of Insurance Commissioners) Model HMO Act, as amended; or

(c) The Carrier shall provide the Contracting Officer with documentation that it has such other appropriate combinations of coverage which would provide protection of Members against provider claims in the event of Carrier insolvency, or inability to pay expenses for any reason.

(d) The Carrier shall notify the Contracting Officer as soon as it is aware that it will not be able to satisfy the requirements stated in subsections (a), (b), or (c) above.

SECTION 2.10
INDEPENDENT LABORATORIES (JAN 1991)

In order to assure a minimum standard of quality for laboratory services, the Carrier agrees that it will not use independent laboratories which do not comply with Medicare or similar standards.

SECTION 2.11
CLAIMS PROCESSING (JAN 1996)

A standardized claims filing process shall be used by all FEHB carriers. Beginning in 1996, the Carrier shall develop and apply procedures for using the standard claims process. At a minimum the Carrier's program must achieve the following objectives:

(1) By the year 2000, the majority of provider claims should be submitted electronically;

(2) By January 1996, all physicians shall be notified that future claims must be submitted electronically or on the Health Care Financing Administration 1500 form;

(3) Beginning no later than June 1996, the Carrier shall not use any unique physician claim form(s) for such FEHB member claims;

(4) Beginning September 1996, Carrier should reject all such claims submitted on forms other than the HCFA 1500 form and shall explain the reason on the Explanation of Benefits form; and

(5) Carrier shall advise OPM of its progress in implementing this policy as directed by the Contracting Officer.

SECTION 2.12 CALCULATION OF COST SHARING PROVISIONS (JAN 1996)

When the Member is required to pay a specified percentage of the cost of covered services, the Member's obligation for covered services shall be based on the amount the provider has agreed to accept as full payment, including future discounts that are known and that can be accurately calculated at the time the claim is processed. This includes for

example, prompt pay discounts as well as other discounts granted for various business reasons.

PART III - PAYMENTS, CHARGES AND ACCOUNTING

SECTION 3.1
PAYMENTS (JAN 1991) (FEHBAR 1652-232-70)

(a) OPM will pay to the Carrier, in full settlement of its obligations under this contract, subject to adjustment for error or fraud, the subscription charges received for the Plan by the Employees Health Benefits Fund (hereinafter called the Fund) less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM, plus any payments made by OPM from the Contingency Reserve.

(b) The specific subscription rates, charges, allowances and limitations applicable to the contract are set forth in Appendix B.

(c) Recurring payments from premiums shall be due and payable not later than thirty days after receipt by the Fund. The Contracting Officer may authorize special nonrecurring payments from the Contingency Reserve in accordance with OPM's regulations.

(d) In the event this contract between the Carrier and OPM is terminated or not renewed in accordance with General Provision 1.15, Renewal and Withdrawal of Approval, the Contingency Reserve of the Carrier held by OPM shall be available to the Carrier to pay the necessary and proper charges against this contract to the extent that the reserves held by the Carrier are insufficient for that purpose.

*[NOTE: The adjustment for error or fraud referenced in paragraph (a) and the necessary and proper charges against this contract if the contract is terminated or not renewed, referenced in subsection (d), shall be limited to the subscription rate and any contingency reserve payment otherwise provided for in this contract and shall not include claim charges or other expenses attributable to individual Members. Further, FEHBAR 1652.216-70, Accounting and Price Adjustment, applies if any adjustment to the contract price is determined.]*

SECTION 3.2
ACCOUNTING AND PRICE ADJUSTMENT (JAN 1991) (FEHBAR 1652.216-70)

(a) *Annual Accounting Statement.* The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in the form prescribed by OPM.

(b) *Adjustment.*

(1) This contract is community rated as defined in FEHBAR 1602.170-2.

(2) The subscription rates agreed to in this contract are derived from the market price, which is a per member per month (PMPM) capitation or its equivalent that applies to a combination of subscriber groups. The market price established in this contract may be an estimate of the Carrier's actual market price that will be in effect during the contract period.

(3) If, for the contract period, the Carrier establishes an actual market price higher than the market price established for this contract and the higher market price is actually paid by the similarly sized subscriber groups (see FEHBAR 1602.170-11), the Carrier may include an adjustment to the next contract period's FEHBP rates to recover the difference between the estimated market price and the actual market price.

(4) If, for the contract period, the Carrier establishes an actual market price lower than the market price established for this contract and the lower market price is actually paid by similarly sized subscriber groups, the Carrier shall reimburse the Fund, for example, by reducing the next contract period's FEHB rates to reflect the difference between the estimated market price and the actual market price.

(5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made

by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group during this contract period.

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and the actual market price, PMPM capitation or revenue requirement.

*[NOTE: As required by 5 U.S.C. 8909(f), this clause is supplemented as follows: Preemption. (1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a Carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund. (2) Paragraph (1) shall not be construed to exempt any Carrier or subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such Carrier or underwriting or plan administration subcontractor from business conducted under 5 U.S.C. Chapter 89, if that tax, fee, or payment is applicable to a broad range of business activity.]*

SECTION 3.3
RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (FEHBAR 1652.215-70)

If any rate established in connection with this contract was increased because (1) the Carrier furnished cost or pricing data that were not complete, accurate, or current as certified in the Certificate of Accurate Pricing for Community Rated Plans (FEHBAR 1615.804-70); [Reference to Standard Form 1412 deleted] (2) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups (see FEHBAR 1602.170-11) as certified in the Certificate of Accurate Pricing for Community Rated Plans [Reference to Standard Form 1412 deleted]; or (3) the Carrier furnished data or information of any description that were not complete, accurate, and current -- then the rate shall be reduced in the amount by which the price was increased because of the defective data or information. When the Contracting Office determines that the Carrier did not charge a market price and the Government is entitled to a refund, the refund shall bear simple interest from the date the overcharge was paid by the Government to the Carrier until the date the overcharge is liquidated. In calculating the amount of interest due, the quarterly rate determinations by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods the overcharge was retained by the Carrier shall be used.

*[Changes to above JAN 1995 clause are made as directed in 60 FR 48206 9/18/95.]*

SECTION 3.4
CONTRACTOR RECORDS RETENTION (FEHBAR 1652.204-70)

Notwithstanding the provisions of Section 5.7 [FAR 52.215-2(d)] *Audit and Records - Negotiation,* [Reference to Standard Form 1412 deleted] the Carrier of a contract of $500,000 or more will retain and make available all records applicable to a contract term that support the annual statement of operations and the rate submission for that contract term for a period of 5 years after the end of the contract term to which the records relate, except that individual enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

*[Changes to above JAN 1991 clause are made as directed in 60 FR 48206 9/18/95.]*

SECTION 3.5
APPROVAL FOR ASSIGNMENT OF CLAIMS
(JAN 1991) (FEHBAR 1652.232-73)

(a) Notwithstanding the provisions of Section 5.35 [FAR 52.232-23], *Assignment of Claims*, the Carrier shall not make any assignment under the Assignment of Claims Act without the prior written approval of the Contracting Officer.

(b) Unless a different period is specified in the Contracting Officer's written approval, an assignment shall be in force only for a period of one year from the date of the Contracting Officer's approval. However, assignments may be renewed upon their expiration.

## PART IV -- SPECIAL PROVISIONS

SECTION 4.1 (FAR 52.252.4)
ALTERATIONS IN CONTRACT (JAN 1996)

Sections 5.30, 5.31, 5.32. Cost Accounting Standards, part 30 of the FAR, has not yet been implemented for the FEHBP. Sections 5.30, 5.31 and 5.32 are not applicable to this contract.

SECTION 5.1
DEFINITIONS. (SEPT 1991) (FAR 52.202-1)

(a) "Head of the agency" (also called "agency head") or "Secretary" means the Secretary (or Attorney General, Administrator, Governor, Chairperson, or other chief official, as appropriate) of the agency; and the term "authorized representative" means any person, persons, or board (other than the Contracting Officer) authorized to act for the head of the agency or Secretary.

(b) Commercial component means any component that is a commercial item.

(c) Commercial item means--

(1) Any item, other than real property, that is of a type customarily used for nongovernmental purposes and that--

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (c)(1) of this clause through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (c)(1) or (c)(2) of this clause, but for--

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. "Minor" modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor;

(4) Any combination of items meeting the requirements of paragraphs (c)(1), (2), (3), or (5) of this clause that are of a type customarily combined and sold in combination to the general public;

(5) Installation services, maintenance services, repair services, training services, and other services if such services are procured for support of an item referred to in paragraphs (c)(1), (2), (3), or (4) of this clause, and if the source of such services--

(i) Offers such services to the general public and the Federal Government contemporaneously and under similar terms and conditions; and

(ii) Offers to use the same work force for providing the Federal Government with such services as the source uses for providing such services to the general public;

(6) Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed under standard commercial terms and conditions. This does not include services that are sold based on hourly rates without an established catalog or market price for a specific service performed;

(7) Any item, combination of items, or service referred to in subparagraphs (c)(1) through (c)(6), notwithstanding the fact that the item, combination of items, or service is transferred between or among separate divisions, subsidiaries, or affiliates of a Contractor; or

(8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local Governments.

(d) Component means any item supplied to the Federal Government as part of an end item or of another component.

(e) Nondevelopmental item means--

(1) Any previously developed item of supply used exclusively for governmental purposes by a Federal agency, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement;

(2) Any item described in paragraph (e)(1) of this definition that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency; or

(3) Any item of supply being produced that does not meet the requirements of paragraph (e)(1) or (e)(2) solely because the item is not yet in use.

(f) "Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer.

(g) Except as otherwise provided in this contract, the term "subcontracts" includes, but is not limited to, purchase orders and changes and modifications to purchase orders under this contract.

SECTION 5.2
[RESERVED]

SECTION 5.3
GRATUITIES. (APR 1984) (FAR 52.203-3)

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) The facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled -

(1) To pursue the same remedies as in a breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

SECTION 5.4
COVENANT AGAINST CONTINGENT FEES. (APR 1984) (FAR 52.203-5)

(a) The Contractor warrants that no person or agency has been employed or retained to solicit or obtain this contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee," as used in this clause, means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to

solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee", as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence," as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

SECTION 5.5
ANTI-KICKBACK PROCEDURES. (JUL 1995) (FAR 52.203-7)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract, and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act), prohibits any person from --

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

(c)(1) The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships.

(2) When the Contractor has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such reports shall be made to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice.

(3) The Contractor shall cooperate fully with any Federal agency investigating a possible violation described in paragraph (b) of this clause.

(4) The Contracting Officer may (i) offset

the amount of the kickback against any monies owed by the United States under the prime contract and/or (ii) direct that the Prime Contractor withhold, from sums owed a subcontractor under the prime contract, the amount of any kickback. The Contracting Officer may order the monies withheld under subdivision (c)(4)(ii) of this clause be paid over to the Government unless the Government has already offset those monies under subdivision (c)(4)(i) of this clause. In either case, the Prime Contractor shall notify the Contracting Officer when the monies are withheld.

(5) The Contractor agrees to incorporate the substance of this clause, including this subparagraph (c)(5) but excepting subparagraph (c)(1), in all subcontracts under this contract which exceed $100,000.

SECTION 5.6
[RESERVED]

SECTION 5.7
AUDIT AND RECORDS - NEGOTIATION (OCT 1995) (FAR 52.215-2)

(a) As used in this clause, records includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) Examination of costs. If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) Cost or pricing data. If the Contractor has been required to submit cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to--

(1) The proposal for the contract, subcontract, or modification;

(2) The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4) Performance of the contract, subcontract or modification.

(d) Comptroller General--(1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder.

(2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) Reports. If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating (1) the effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports and (2) the data reported.

(f) Availability. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records

Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statue or by other clauses of this contract. In addition--

(1) If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement; and

(2) Records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (a) [sic], in all subcontracts under this contract that exceed the simplified acquisition threshold in FAR Part 13, and--

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

SECTION 5.8
[RESERVED]

SECTION 5.9
PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA -- MODIFICATIONS. (OCT 1995) (FAR 52.215-23)

(a) This clause shall become operative only for any modification to this contract involving a pricing adjustment expected to exceed the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1), except that this clause does not apply to any modification if an exception under FAR 15.804-1 applies.

(b) If any price, including profit or fee, negotiated in connection with any modification under this clause, or any cost reimbursable under this contract, was increased by any significant amount because (1) the Contractor or a subcontractor furnished cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data, (2) a subcontractor or prospective subcontractor furnished the Contractor cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data, or (3) any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction. This right to a price reduction is limited to that resulting from defects in data relating to modifications for which this clause becomes operative under paragraph (a) of this clause.

(c) Any reduction in the contract price under paragraph (b) of this clause due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract or (2) the actual cost to the Contractor, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor; provided, that the actual subcontract price was not itself affected by defective cost or pricing data.

(d)(1) If the Contracting Officer determines under paragraph (b) of this clause that a price or cost reduction should be made, the Contractor agrees not to raise the following matters as a defense:

(i) The Contractor or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost of pricing data had been submitted.

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Contractor or

subcontractor took no affirmative action to bring the character of the data to the attention of the Contracting Officer.

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract.

(iv) The Contractor or subcontractor did not submit a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (d)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if-

(A) The Contractor certifies to the Contracting Officer that, to the best of the Contractor's knowledge and belief, the Contractor is entitled to offset in the amount requested; and

(B) The Contractor proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if-

(A) The understated data was known by the Contractor to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(e) If any reduction in the contract price under this clause reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the Contractor shall be liable to and shall pay the United States at the time such overpayment is repaid--

(1) Simple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and

(2) A penalty equal to the amount of the overpayment, if the Contractor or subcontractor knowingly submitted cost or pricing data which were incomplete, inaccurate, or non-current.

SECTION 5.10
[RESERVED]

SECTION 5.11
SUBCONTRACTOR COST OR PRICING DATA - MODIFICATIONS. (OCT 1995) (FAR 52.215-25)

(a) The requirements of paragraphs (b) and (c) of this clause shall (1) become operative only for any modification to this contract involving a pricing adjustment expected to exceed the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1); and (2) be limited to such modifications.

(b) Before awarding any subcontract expected to exceed the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1) on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1), the Contractor shall require the subcontractor to submit cost or pricing data (actually or by specific identification in writing), unless an exception under FAR 15.804-1 applies.

(c) The Contractor shall require the subcontractor to certify in substantially the form prescribed in subsection 15.804-4 of the Federal Acquisition Regulation (FAR) that, to the best of its knowledge and belief, the data submitted under paragraph (b) of this clause were accurate, complete, and current as of the date of agreement on the negotiated price of the subcontract or subcontract modification.

(d) The Contractor shall insert the substance of this clause, including this paragraph (d), in each subcontract that exceeds the threshold for submission of cost or pricing data at FAR 15.804-2(a)(1), on the date of agreement on price or the date of award, whichever is later.