A standardized claims filing process shall be used by all FEHB carriers. The Carrier shall develop and apply procedures for using the standard claims process. At a minimum the Carrier's program must achieve the following objectives:

(1) By the year 2000, the majority of provider claims should be submitted electronically;

(2) All physicians shall be notified that future claims must be submitted electronically or on the Health Care Financing Administration 1500 form;

(3) The Carrier shall not use any unique physician claim form(s) for such FEHB member claims;

(4) The Carrier should reject all such claims submitted on forms other than the HCFA 1500 form and shall explain the reason on the Explanation of Benefits form; and

(5) The Carrier shall advise OPM of its progress in implementing this policy as directed by the Contracting Officer.

11. A new Section 2.13, BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY, is added to read as follows:

BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY (JAN 1998)

When a Member who is covered by Medicare Part A, Part B, or Parts A and B on a fee-for-service basis (a) receives services that generally are eligible for coverage by Medicare (regardless of whether or not benefits are paid by Medicare) and are covered by the Carrier, and (b) Medicare is the primary payer and the Carrier is the secondary payer for the Member under the order of benefit determination rules stated in Appendix A of this contract, then the Carrier shall, where there is no adverse effect on the enrollee, limit its payment to an amount that supplements the benefits payable by Medicare (regardless of whether or not Medicare benefits are paid). When emergency services have been provided by a Medicare nonparticipating institutional provider and the provider is not reimbursed by Medicare, the Carrier shall pay its primary benefits. Payments that supplement Medicare include amounts necessary to reimburse the Member for Medicare deductibles, coinsurance, and the balance between the Medicare approved amount and the Medicare limiting charge made by non-participating providers. This provision does not apply to debarred providers (see Section 2.7).

12. Section 3.2, ACCOUNTING AND PRICE ADJUSTMENT, is redated JAN 1998, the material in brackets is moved to Section 4.1, and the clause is amended to reflect regulatory changes effective January 1, 1998, as follows:

ACCOUNTING AND PRICE ADJUSTMENT
(JAN 1998) (FEHBAR 1652.216-70)

(a) *Annual Accounting Statement.*
The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in the form prescribed by OPM.

(b) *Adjustment.*

(1) This contract is community rated as defined in FEHBAR 1602.170-2.

(2) The subscription rates agreed to in this contract shall be equivalent to the subscription rates given to the carrier's similarly sized subscriber groups (SSSGs) as defined in FEHBAR §1602.170-12.

(3) If, at the time of the rate reconciliation, the subscription rates are found to be lower than the equivalent rates for the lower of the two SSSGs, the carrier may include an adjustment to the Federal group's rates for the next contract period.

(4) If, at the time of the rate reconciliation, the subscription rates are found to be higher than the equivalent rates for the lower of the two SSSGs, the Carrier shall reimburse the Fund, for example, by reducing the FEHB rates for the next contract term to reflect the difference between

the estimated rates and the rates which are derived using the methodology of the lower rated SSSG.

(5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group during this contract period.

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

(End of Clause)

13. Section 3.3, RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA, is dated JAN 1998 and amended to reflect regulatory changes effective January 1, 1998, as follows:

RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (JAN 1998) (FEHBAR 1652.215-70)

(a) If any rate established in connection with this contract was increased because (1) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not complete, accurate, or current as certified in the Certificate of Accurate Cost or Pricing Data (FEHBAR 1615.804-70); (2) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not accurate as represented in the rate proposal documents; (3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups (see FEHBAR §1602.170-12) as certified in the Certificate of Accurate Cost or Pricing Data for Community Rated Carriers; or (4) the Carrier submitted or, or kept in its files in support of the FEHBP rate, data or information of any description that were not complete, accurate, and current--then, the rate shall be reduced in the amount by which the price was increased because of the defective data or information.

(b)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Carrier agrees not to raise the following matters as a defense:

(i) The Carrier was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost or pricing data had been submitted or maintained and identified.

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Carrier took no affirmative action to bring the character of the data to the attention of the Contracting Officer.

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract.

(iv) The Carrier did not submit or keep in its files a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (b)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if--

(A) The Carrier certifies to the Contracting Officer that, to the best of the Carrier's knowledge and belief, the Carrier is entitled to the offset in the amount requested; and

(B) The Carrier proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if--

(A) The understated data was known by the Carrier to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(c) When the Contracting Officer determines that the rates shall be reduced and the Government is thereby entitled to a refund, the Carrier shall be liable to and shall pay the FEHB Fund at the time the overpayment is repaid--

(1) Simple interest on the amount of the overpayment from the date the overpayment was paid from the FEHB Fund to the Carrier until the date the overcharge is liquidated. In calculating the amount of interest due, the quarterly rate determinations by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods the overcharge was retained by the Carrier shall be used; and,

(2) A penalty equal to the amount of overpayment, if the Carrier knowingly submitted cost or pricing data which was incomplete, inaccurate, or noncurrent.

(End of Clause)

14. Section 3.4, CONTRACTOR RECORDS RETENTION, is redated JAN 1998 and amended to reflect changes in the Federal Acquisition Regulations (FAR), as follows:

Notwithstanding the provisions of Section 5.7 (FAR 52.215-2(d)) *Audit and Records - Negotiation* the Carrier shall retain and make available all records applicable to a contract term that support the annual statement of operations and the *rate submission* and, for contracts that exceed the threshold at FAR 15.804-2(a)(1), the rate submission for that contract term for a period of 5 years after the end of the contract term to which the records relate, except that individual enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

15. Section 4.1, ALTERATIONS IN CONTRACT, is redated JAN 1998, the FAR citation is moved to the end of the heading, the existing paragraph is numbered (a) and a paragraph which was formerly located at the end of paragraph (b)(6) in Section 3.2, is added as paragraph (b), as follows:

SECTION 4.1 ALTERATIONS IN CONTRACT
(JAN 1998) (FAR 52.252.4)

Portions of this contract are altered as follows:

(a) Sections 5.30, 5.31, 5.32. Cost Accounting Standards, part 30 of the FAR, has not yet been implemented for the FEHBP community rated contracts. Sections 5.30, 5.31 and 5.32 are not applicable to this contract.

(b) Section 3.2. As required by Public Law 101-508, § 8909 of title 5, U.S.C., and Section 3.2(b)(ii) of this contract are amended by the following:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a Carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any Carrier or subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such Carrier or underwriting or plan administration subcontractor from business conducted under this Chapter, if that tax, fee, or payment is applicable to a broad range of business activity.

16. Section 5.7, AUDIT & RECORDS-NEGOTIATION, is redated AUG 1996 and amended to conform to revisions to the FAR, as follows:

AUDIT AND RECORDS-NEGOTIATION (AUG 1996) (FAR 52.215-2)

(a) As used in this clause, "records" includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) *Examination of costs.* If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) *Cost or pricing data.* If the Contractor has been required to submit cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to--

(1) The proposal for the contract, subcontract, or modification;

(2) The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4) Performance of the contract, subcontract or modification.

(d) *Comptroller General*--(1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder.

(2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) *Reports.* If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating (1) the effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports and (2) the data reported.

(f) *Availability.* The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition--

(1) If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement; and

(2) Records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract that exceed the simplified acquisition threshold and--

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

17. Section 5.9, PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA--MODIFICATIONS, is deleted, because Section 3.3, RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (FEHBAR 1652.215-70) captures all of the FAR defective cost or pricing data elements as they relate to the FEHB Program:

SECTION 5.9 [RESERVED]

18. Section 5.11, SUBCONTRACTOR COST OR PRICING DATA--MODIFICATIONS, is deleted to reflect regulatory changes effective January 1, 1998, as follows:

SECTION 5.11 [RESERVED]

19. Section 5.14, UTILIZATION OF SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED SMALL BUSINESS CONCERNS, is redated JUN 1997 and amended to conform to revisions to the FAR, as follows:

UTILIZATION OF SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED SMALL BUSINESS CONCERNS (JUN 1997)(FAR 52.219-8)

(d) The term "small business concern owned and controlled by women" shall mean a small business concern (1) which is at least 51 percent owned by one or more women, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women, and (2) whose management and daily business operations are controlled by one or more women.

****

20. Section 5.25, DRUG-FREE WORKPLACE, is redated JAN 1997 and amended to reflect changes in the FAR, as follows:

(b) The Contractor, if other than an individual, shall - within 30 days after award (unless a longer period is agreed to in writing for contracts of 30 days or more performance duration); or as soon as possible for contracts of less than 30 days performance duration -

(1) Publish a statement notifying its employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

(2) Establish an ongoing drug-free awareness program to inform such employees about-

(i) The dangers of drug abuse in the workplace;

(ii) The contractor's policy of maintaining a drug-free workplace;

(iii) Any available drug counseling, rehabilitation, and employee assistance programs; and

(iv) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace.

(3) Provide all employees engaged in performance of the contract with a copy of the statement required by subparagraph (b)(1) of this clause;

(4) Notify such employees in writing in the statement required by subparagraph (b)(1) of this clause that, as a condition of continued employment on this contract, the employee will -

(i) Abide by the terms of the statement; and

(ii) Notify the employer in writing of the employee's conviction under a criminal drug statute for a violation occurring in the workplace no later than 5 days after such conviction.

(5) Notify the Contracting Officer in writing within 10 days after receiving notice under subdivision (b)(4)(ii) of this clause, from an employee or otherwise receiving actual notice of such conviction. The notice shall include the position title of the employee;

(6) Within 30 days after receiving notice under subdivision (b)(4)(ii) of this clause of a conviction, take one of the following actions with respect to any employee who is convicted of a drug abuse violation occurring in the workplace:

(i) Taking appropriate personnel action against such employee, up to and including termination; or

(ii) Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and

(7) Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs (b)(1) through (b)(6) of this clause.

(c) The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, not to engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance while performing this contract.

****

21. Section 5.29, TAXES--FOREIGN FIXED-PRICE CONTRACTS, is deleted because there are currently no FEHB Program prepaid carrier contracts with foreign countries.

SECTION 5.29 [RESERVED]

22. Section 5.33, DISCOUNTS FOR PROMPT PAYMENT, is redated MAY 1997 and amended to conform to changes to the FAR, as follows:

DISCOUNTS FOR PROMPT PAYMENT (MAY 1997) (FAR 52.232-8)

(a) Discounts for prompt payment will not be considered in the evaluation of offers. However, any offered discount will form a part of the award, and will be taken if payment is made within the discount period indicated in the offer by the offeror. As an alternative to offering a prompt payment discount in conjunction with the offer, offerors awarded contracts may include prompt payment discounts on individual invoices.

(b) In connection with any discount offered for prompt payment, time shall be computed from the date of the invoice. If the Contractor has not placed a date on the invoice, the due date shall be calculated from the date the designated billing office receives a proper invoice, provided the agency annotates such invoice with the date of receipt at the time of receipt. For the purpose of computing the discount earned, payment shall be considered to have been made on the date that appears on the payment check or, for an electronic funds transfer, the specified payment date. When the discount date falls on a Saturday, Sunday, or legal holiday when Federal Government offices are closed and Government business is not expected to be conducted, payment may be made on the following business day.

23. Section 5.34, INTEREST, is redated JUN 1996 and amended to conform to revisions in the FAR, as follows:

INTEREST (JUN 1996) (FAR 52.232-17) FEHBAR (JAN 1995)

(a) Except as otherwise provided in this contract under a Price Reduction for Defective Cost or Pricing Data clause or a Cost Accounting Standards clause, all amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

****

24. Section 5.38, CHANGES--FIXED PRICE-ALTERNATE I, is deleted and replaced with an FEHB-specific clause, which is substantially the same, as follows:

CHANGES--NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.243-70)

(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:

(1) Description of services to be performed.

(2) Time of performance (i.e., hours of the day, days of the week, etc.).

(3) Place of performance of the services.

(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

(c) The Carrier must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.

(d) Failure to agree to any adjustment shall be a dispute under the Disputes clause. However, nothing in this clause shall excuse the Carrier from proceeding with the contract as changed.

25. Section 5.39, COMPETITION IN SUBCONTRACTING, is removed and reserved because it has no practical application to community-rated contracts:

SECTION 5.39 [RESERVED]

26. Section 5.40, GOVERNMENT PROPERTY (FIXED PRICE CONTRACTS), is deleted and replaced with an FEHB-specific clause which is substantially the same, as follows:

GOVERNMENT PROPERTY (NEGOTIATED BENEFITS CONTRACTS)
(JAN 1998) (FEHBAR 1652.245-70)

(a) Government-furnished property. (1) The Government shall deliver to the Carrier, for use in connection with and under the terms of this contract, the Government-furnished property described in this contract together with any related data and information that the Carrier may request and is reasonably required for the intended use of the property (hereinafter referred to as "Government-furnished property").

(2) The delivery or performance dates for this contract are based upon the expectation that Government-furnished property suitable for use (except for property furnished "as-is") will be delivered to the Carrier at the times stated in this contract or, if not so stated, in sufficient time to enable the Carrier to meet the contract's performance dates.

(3) If Government-furnished property is received by the Carrier in a condition not suitable for the intended use, the Carrier shall, upon receipt of it, notify the Contracting Officer, detailing the facts, and, as directed by the Contracting Officer and at Government expense, either repair, modify, return, or otherwise dispose of the property. After completing the directed action and upon written request of the Carrier, the Contracting Officer shall make an equitable adjustment as provided in paragraph (h) of this clause.

(b) Changes in Government-furnished property. (1) The Contracting Officer may, by written notice, (i) decrease the Government-furnished property provided or to be provided under this contract, or (ii) substitute other Government-furnished property for the property to be provided by the Government, or to be acquired by the Carrier for the Government, under this contract. The Carrier shall promptly take such action as the Contracting Officer may direct regarding the removal, shipment, or disposal of the property covered by such notice.

(2) Upon the Carrier's written request, the Contracting Officer shall make an equitable adjustment to the contract in accordance with paragraph (h) of this clause, if the Government has agreed in this contract to make the property available for performing this contract and there is any -

(i) Decrease or substitution in this property pursuant to subparagraph (b)(1) above; or

(ii) Withdrawal of authority to use this property, if provided under any other contract or lease.

(c) Title in Government property. (1) The Government shall retain title to all Government-furnished property.

(2) All Government-furnished property and all property acquired by the Carrier, title to which vests in the Government under this paragraph (collectively referred to as "Government property"), are subject to the provisions of this clause. Title to Government property shall not be affected by its incorporation into or attachment to any property not owned by the Government, nor shall Government property become a fixture or lose its identity as personal property by being attached to any real property.

(d) Use of Government property. The Government property shall be used only for performing this contract, unless otherwise provided in this contract or approved by the Contracting Officer.

(e) Property administration. (1) The Carrier shall be responsible and accountable for all Government property provided under this contract and shall comply with Federal Acquisition Regulation (FAR) subpart 45.5, as in effect on the date of this contract.

(2) The Carrier shall establish and maintain a program for the use, maintenance, repair, protection, and preservation of Government property in accordance with sound industrial practice and the applicable provisions of subpart 45.5 of the FAR.

(3) If damage occurs to Government property, the risk of which has been assumed by the Government under this contract, the Government shall replace the items or the Carrier shall make such repairs as the Government directs. However, if the Carrier cannot effect such repairs within the time required, the Carrier shall dispose of the property as directed by the Contracting Officer. When any property for which the Government is responsible is replaced or repaired, the Contracting Officer shall make an equitable adjustment in accordance with paragraph (h) of this clause.

(4) The Carrier represents that the contract price does not include any amount for repairs or replacement for which the Government is responsible. Repair or replacement of property for which the Carrier is responsible shall be accomplished by the Carrier at its own expense.

(f) Access. The Government and all its designees shall have access at all reasonable times to the premises in which any Government property is located for the purpose of inspecting the Government property.

(g) Risk of loss. Unless otherwise provided in this contract, the Carrier assumes the risk of, and shall be responsible for, any loss or destruction of, or damage to, Government property upon its delivery to the Carrier. However, the Carrier is not responsible for reasonable wear and tear to Government property or for Government property properly consumed in performing this contract.

(h) Equitable adjustment. When this clause specifies an equitable adjustment, it shall be made to any affected contract provision in accordance with the procedures of the Changes clause. When appropriate, the Contracting Officer may initiate an equitable adjustment in favor of the Government. The right to an equitable adjustment shall be the Carrier's exclusive remedy. The Government shall not be liable to suit for breach of contract for --

(1) Any delay in delivery of Government-furnished property;

(2) Delivery of Government-furnished property in a condition not suitable for its intended use;

(3) A decrease in or substitution of Government-furnished property; or

(4) Failure to repair or replace Government property for which the Government is responsible.

(i) Final accounting and disposition of Government property. Upon completing this contract, or at such earlier dates as may be fixed by the Contracting Officer, the Carrier shall submit, in a form acceptable to the Contracting Officer, inventory schedules covering all items of Government property (including any resulting scrap) not consumed in performing this contract or delivered to the Government. The Carrier shall prepare for shipment, deliver f.o.b. origin, or dispose of the Government property as may be directed or authorized by the Contracting Officer. The net

proceeds of any such disposal shall be credited to the contract price or shall be paid to the Government as the Contracting Officer directs.

(j) Abandonment and restoration of Carrier's premises. Unless otherwise provided herein, the Government -

(1) May abandon any Government property in place, at which time all obligations of the Government regarding such abandoned property shall cease; and

(2) Has no obligation to restore or rehabilitate the Carrier's premises under any circumstances (e.g., abandonment, disposition upon completion of need, or upon contract completion). However, if the Government-furnished property is withdrawn or is unsuitable for the intended use, or if other Government property is substituted, then the equitable adjustment under paragraph (h) of this clause may properly include restoration or rehabilitation costs.

(k) Communications. All communications under this clause shall be in writing.

(l) Overseas contracts. If this contract is to be performed outside of the United States of America, its territories, or possessions, the words "Government" and "Government- furnished" (wherever they appear in this clause) shall be construed as "United States Government" and "United States Government-furnished", respectively.

27. Section 5.42, PREFERENCE FOR U.S.-FLAG AIR CARRIERS, is redated JAN 1997 and amended to reflect changes to the FAR, as follows:

PREFERENCE FOR U.S.-FLAG AIR CARRIERS (JAN 1997) (FAR 52.247-63)

(a) "International air transportation," as used in this clause, means transportation by air between a place in the United States and a place outside the United States or between two places both of which are outside the United States.

"United States," as used in this clause, means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and possessions of the United States.

"U.S.-flag air carrier," as used in this clause, means an air carrier holding a certificate under 49 U.S.C. Chapter 411).

****

(d) In the event that the Contractor selects a carrier other than a U.S.-flag air carrier for international air transportation, the Contractor shall include a statement on vouchers involving such transportation essentially as follows:

STATEMENT OF UNAVAILABILITY OF U.S.-FLAG AIR CARRIERS

International air transportation of persons (and their personal effects) or property by U.S.-flag air carrier was not available or it was necessary to use foreign-flag air carrier service for the following reasons (see section 47.403 of the Federal Acquisition Regulation): (State reasons):

(End of statement)

(e) The Contractor shall include the substance of this clause, including this paragraph (e), in each subcontract or purchase under this contract that may involve international air transportation.

28. Section 5.45, LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS, is redated JUNE 1997 and amended to conform to revisions to the FAR, as follows:

LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN
FEDERAL TRANSACTIONS (JUN 1997) (FAR.52.203-12)

(a) *Definitions.*

"Agency," as used in this clause, means executive agency as defined in FAR 2.101.

"Covered Federal action," as used in this clause, means any of the following Federal actions:

(1) The awarding of any Federal contract.

(2) The making of any Federal grant.

(3) The making of any Federal loan.

(4) The entering into of any cooperative agreement.

(5) The extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

* * * *

"Officer or employee of an agency," as used in this clause, includes the following individuals who are employed by an agency:

(1) An individual who is appointed to a position in the Government under title 5, United States Code, including a position under a temporary appointment.

(2) A member of the uniformed services, as defined in subsection 101(3), title 37, United States Code.

(3) A special Government employee, as defined in section 202, title 18, United States Code.

(4) An individual who is a member of a Federal advisory committee, as defined by the Federal Advisory Committee Act, title 5, United States Code, appendix 2.

* * * *

29. Section 5.46, REQUIREMENT FOR CERTIFICATE OF PROCUREMENT INTEGRITY--MODIFICATION, is deleted in conformance with the FAR, as follows:

SECTION 5.46 [RESERVED]

30. Section 5.49, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE), is deleted and replaced by an FEHB-specific clause which is substantially the same, as follows:

FEHBP TERMINATION FOR CONVENIENCE OF THE GOVERNMENT--
NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.249-71)

(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Carrier a Notice of Termination specifying the extent of terminating and the effective date.

(b) After receipt of a Notice of Termination, and except as directed by the Contracting Officer, the Carrier shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this clause:

(1) Stop work as specified in the notice.

(2) Place no further subcontracts except as necessary to complete the continued portion of the contract.

(3) Terminate all subcontracts to the extent they relate to the work terminated.

(4) Assign to the Government, as directed by the Contracting Officer, all right, title, and interest of the Carrier under the subcontracts terminated, in which case the Government shall have the right to settle or to pay any termination settlement proposal arising out of those terminations.

(5) With approval or ratification to the extent required by the Contracting Officer, settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts; the approval or ratification will be final for purposes of this clause.

(6) As directed by the Contracting Officer, deliver to the Government any data, reports, or studies that, if the contract had been completed, would be required to be furnished to the Government.

(7) Complete performance of the work not terminated.

(c) After termination, the Carrier shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Carrier shall submit the proposal promptly, but no later than 1 year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Carrier within this 1-year period. However, if the Contracting Officer determines that the facts justify it, a termination settlement proposal may be received and acted on after 1 year or any extension. If the Carrier fails to submit the proposal within the time allowed, the Contracting Officer may determine, on the basis of information available, the amount, if any, due the Carrier because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Carrier and the Contracting Officer may agree upon the whole or any part of the amount to be paid or remaining to be paid because of the termination. The amount may include a reasonable allowance for profit on work done. However, the agreed amount, whether under this paragraph (d) or paragraph (e) of this clause, exclusive of costs shown in subparagraph (e)(3) of this clause, may not exceed the total contract price as reduced by (1) the amount of payments previously made and (2) the contract price of work not terminated. The contract shall be modified, and the Carrier paid the agreed amount. Paragraph (e) of this clause shall not limit, restrict, or affect the amount that may be agreed upon to be paid under this paragraph.

(e) If the Carrier and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Carrier the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (d) above:

(1) The contract price for completed services accepted by the Government not previously paid for.

(2) The total of--

(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to services paid or to be paid under paragraph (e)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (e)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (e)(2)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable.

(3) The reasonable costs of settlement of the work terminated, including--

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(f) The cost principles and procedures of part 31 of the Federal Acquisition Regulation, in effect on the date of this contract, shall govern all costs claimed, agreed to, or determined under this clause.

(g) The Carrier shall have the right of appeal, under the Disputes clause, from any determination made by the Contracting Officer under paragraph (c), (e), or (i) of this clause, except that if the Carrier failed to submit the termination settlement proposal or request for equitable adjustment within the time provided in paragraph (c) or (i), respectively, and failed to request a time extension, there is no right of appeal.

(h) In arriving at the amount due the Carrier under this clause, there shall be deducted--

(1) All unliquidated advance or other payments to the Carrier under the terminated portion of this contract;

(2) Any claim which the Government has against the Carrier under this contract; and

(i) If the termination is partial, the Carrier may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract. The Contracting Officer shall make any equitable adjustment agreed upon. Any proposal by the Carrier for an equitable adjustment under this clause shall be requested within 90 days from the effective date of termination unless extended in writing by the Contracting Officer.

(j)(1) The Government may, under the terms and conditions it prescribes, make partial payments and payments against costs incurred by the Carrier for the terminated portion of the contract, if the Contracting Officer believes the total of these payments will not exceed the amount to which the Carrier will be entitled.

(2) If the total payments exceed the amount finally determined to be due, the Carrier shall repay the excess to the Government upon demand, together with interest computed at the rate established by the Secretary of the Treasury under 50 U.S.C. App. 1215(b)(2). Interest shall be computed for the period from the date the excess payment is received by the Carrier to the date the excess is repaid.

(k) Unless otherwise provided in this contract or by statute, the Carrier shall maintain all records and documents relating to the terminated portion of this contract for 3 years after final settlement. This includes all books and other evidence bearing on the Carrier's costs and expenses under this contract. The Carrier shall make these records and documents available to the Government, at the Carrier's office, at all reasonable times, without any direct charge. If approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions may be maintained instead of original records and documents.

31. Section 5.50, DEFAULT (Fixed Price Supply and Service), is deleted and replaced by an FEHB-specific clause, which is substantially the same, as follows:

FEHBP TERMINATION FOR DEFAULT--NEGOTIATED BENEFITS CONTRACTS
(JAN 1998) (FEHBAR 1652.249-72)

(a) (1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Carrier, terminate this contract in whole or in part if the Carrier fails to--

(i) Perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Carrier does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

(b) If the Government terminates this contract in whole or in part, it may acquire, under the terms and in the manner the Contracting Officer considers appropriate, supplies or service similar to those terminated, and the Carrier will be liable to the Government for any excess costs for those supplies or services. However, the Carrier shall continue the work not terminated.

(c) Except for defaults of subcontractors at any tier, the Carrier shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Carrier. Examples of such causes include (1) acts of God or of the public enemy, (2) acts of the Government in either its sovereign or contractual capacity, (3) fires, (4) floods, (5) epidemics, (6) quarantine restrictions, (7) strikes, (8) freight embargoes, and (9) unusually severe weather. In each instance the failure to perform must be beyond the control and without the fault or negligence of the Carrier.

(d) If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the Carrier and subcontractor, and without the fault or negligence of either, the Carrier shall not be liable for any excess costs for failure to perform, unless the subcontracted supplies or services were obtainable from other sources in sufficient time for the Carrier to meet the required delivery schedule.

(e) If this contract is terminated for default, the Government may require the Carrier to transfer title and deliver to the Government, as directed by the Contracting Officer, any completed or partially completed information and contract rights that the Carrier has specifically produced or acquired for the terminated portion of this contract.

(f) If, after termination, it is determined that the Carrier was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

(g) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

32. Section 5.52, REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS OTHER THAN PENSIONS [PRB], is deleted because it has no practical application to community rated carriers:

SECTION 5.52 [RESERVED]

33. Section 5.53, NOTICE TO THE GOVERNMENT OF LABOR DISPUTES, is redated FEB 1997 and amended to reflect revisions in the FAR, as follows:

NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
(FEB 1997) (FAR 52.222-1)

If the Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this contract, the Contractor shall immediately give notice, including all relevant information, to the Contracting Officer.

34. Section 5.56, AUTHORIZATION AND CONSENT, is redated JUL 1995 and amended to conform with revisions to the FAR, as follows:

AUTHORIZATION AND CONSENT (JUL 1995) (FAR 52.227-1)

(b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services expected to exceed the simplified acquisition threshold); however, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, does not affect this authorization and consent.

35. Section 5.57, NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT, is redated AUG 1996, as follows:

NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT
(AUG 1996) (FAR 52.227-2)

36. The title of Section 5.58, MANDATORY INFORMATION FOR ELECTRONIC FUNDS TRANSFER PAYMENT, is amended to reflect the FAR clause reference, as follows:

MANDATORY INFORMATION FOR ELECTRONIC FUNDS
TRANSFER PAYMENT (AUG 1996) (FAR 52.232-33)

37. In Appendix C, a last sentence is added at the bottom of the page as follows:

As required by Section 1.7, if any information on this sheet changes, you must notify your Contract Representative immediately.

38. In Appendix D-a, the title sheet is redated to read (RV JAN 1998), paragraph (a), the second and fourth paragraphs under paragraph (d), and paragraphs (e) and (f) are updated as follows:

a) GENERAL

1. Section 1.13 of the FEHB contract requires that the Carrier may not distribute or display marketing materials or other supplemental literature (including prepaid plan provider directories) in a Federal facility or arrange for the distribution of such documents by Federal agencies unless the documents have been prepared in accordance with FEHBAR 1652.203-70, and the Carrier has certified to OPM that is the case.

****

d) ENROLLMENT INSTRUCTIONS

****

The Federal document for enrolling in a Plan or changing an existing enrollment in a Plan from Self Only to Self and Family (or the reverse) is the Standard Form (SF) 2809 (or OPM 2809-EZ for annuitants), or by electronic transmittal. The effective date for Open Season enrollments is the first day of the first pay period which begins on or after January 1 for employees; the effective date generally is January 1 for annuitants. The specific effective date for an individual will be assigned by the individual's personnel office.

****

The agencies are the primary contact point for employees on health benefits enrollment matters. OPM's Office of Retirement Programs performs this function for annuitants (retirees). As highlighted below, Carriers may not impose their own enrollment requirements and procedures.

1. Do not give specific instructions on enrollment.

2. While the Carrier may ask enrollees for information (see Section F) and may follow-up with enrollees and, when necessary, the employing office, do not require that a member complete plan specific enrollment or application forms. (You may ask the enrollee to complete "information" forms.) You may ask the enrollee to keep you advised of family member changes and you may verify the change, but failure to complete a form does not render an eligible dependent ineligible.

****

e) PROVIDER DIRECTORIES

Carriers must distribute a provider directory along with the Plan's Federal brochure. The directory must conform to the requirements listed below. You must either insert (but not affix) a copy of it into all of your Federal brochures (except that provider directories are not to be inserted in the brochures you will be sending to OPM in Iowa City, IA or Alexandria, VA) or otherwise make them readily available to agencies and employees. Please send a provider directory to any Federal annuitant who requests a copy. Agencies and their employees will be advised to expect your provider directory.

Please bear in mind that a Federal employee or annuitant choosing your Plan during the Open Season is doing so with the expectation that the Plan's provider directory is accurate and that providers shown will be available starting January 1.

1. Show the Plan's medical facilities (if a group practice Plan) or individual physicians (if an individual practice Plan) or both (if a mixed model Plan). Show the Plan's hospitals also. State the addresses of the medical facilities and show the general location within the service area for individual doctors and hospitals.

2. In the directory, display prominently the following statement: "*It is important to know when you enroll in this Plan, services are provided through the Plan's delivery system, as described in the Plan's Federal brochure, but the continued participation of any one doctor, hospital or other provider cannot be guaranteed.*"

3. Do not list enrollment or eligibility requirements on the provider directory.

4. If the geographic area from which the Carrier will accept enrollments is listed on the provider directory, show it exactly as stated in the Plan's Federal brochure. Likewise, show only the service area which has been approved by OPM. Do not list providers (or areas) located outside the service area (or additional geographic area) shown in the Plan's Federal brochure.

f) INFORMATION FORMS

You may distribute forms to obtain information from enrollees about the enrollee and any dependents. For instance, to obtain the information regarding Medicare you will need for rate-setting

purposes under the Federal Program, you may ask who is enrolled under Medicare Part A, Medicare Part B or Medicare Parts A and B. For another example, prepaid Carriers may ask that a primary care doctor be selected. If you wish to distribute an information form, you may find such forms are more readily returned if they are postage-paid. The form should follow the requirements listed below:

(1) Include the statement under Section D1 of these Guidelines on the forms.

(2) If the member must select a medical group or IPA, also provide space for the member to make such a selection.

(3) Do not indicate enrollment in the Plan is contingent upon completing and returning the form.

United States
**Office of Personnel Management**

Washington, D.C. 20415-0001
In Reply Refer To: Your Reference:

Ms. Michelle Delegram AUG 11 1998
Scott & White Health Plan
Chief Financial Officer
2401 South 31st Street
Temple, Texas 76508

Dear Ms. Delegram:

This letter concerns Scott & White Health Plan's 1999 rates for the Federal group and represents conclusions reached by you with Chris McMillen of this office.

We have calculated the difference between the 1998 contract rates and the rates that should be charged based on your plan's actual community rates in effect on January 1, 1998 and the information you provided about the plan's Similarly Sized Subscriber Groups (SSSGs). The result of this reconciliation, based on our payroll headcounts of 2703 Single and 2538 Family on March 31, 1998, is that your plan is due $754,678. This takes into account $7,893 for brochure printing costs. A copy of our calculations is enclosed.

OPM will make a contingency reserve payment to your plan of $754,678 in the near future.

Based on current estimates, as of December 31, 1998, your plan will have a contingency reserve balance approximately $1,839,750 in excess of its preferred minimum balance. This amount will be used to offset the proposed 1999 rates. That is, we will reduce your plan's proposed 1999 rates in order to generate a contingency reserve payment of approximately $1,839,750. The precise amount of the contingency reserve payment will depend on the plan's March 31, 1999 enrollment and the actual community rate as of January 1, 1999.

Therefore, we will reduce your plan's 1999 biweekly rates by $7.59 per self enrollment and $19.72 per family enrollment. These loadings assume a 1999 enrollment of 2,703 self and 2,538 family.

Specifically, the 1999 net-to-carrier rate proposal is revised as follows:

#1 Reduced rates to Generate a Reserve to Pay Jan 1998

| | Self | Family |
|---|---|---|
| Proposed biweekly rates | $110.01 | $285.75 |
| Adjustment to generate a contingency reserve payment | ($7.59) | ($19.72) |
| Counterproposed 1999 Rates | $102.42 | $266.03 |

As soon as your plan's actual 1999 rates and March 31, 1999 enrollment are known, we will perform a final reconciliation. We will determine the precise amount due the plan and pay the plan this amount from the contingency reserve.

To be in compliance with Section 3.6 of your contract, these rates include the enrollment discrepancy loading of one percent. Please confirm acceptance of OPM's counterproposal by August 14, 1998. You must confirm your rates by that date for us to meet our printing deadlines. If necessary to meet the deadline, please use an express mail service.

Send two copies of your reply, one for this office and one for Health Benefits Contract Division, to:

Ms. Nancy Kichak
Office of Actuaries
Office of Personnel Management
Room 4307
1900 E Street, NW
Washington, DC 20415

The above address is suitable for express mail.

Sincerely,

Nancy H. Kichak
Director
Office of Actuaries

Enclosures

cc: Mike Garth

Copy Ross
Michelle

rcvd 8/10
postmarked 8/3

United States
**Office of**
**Personnel Management**

Washington, D.C. 20415-0001

JUL 30 1999

In Reply Refer To:

Your Reference

Ms. Michelle Delegram
Scott and White
22401 South 31st Street
Temple, TX 76508

Dear Ms. Delegram:

This letter concerns Scott and White (Code UF)'s 2000 rates for the Federal group and represents conclusions reached by you with Jared Wessel of this office.

We have calculated the difference between the 1999 contract rates and the rates that should be charged based on your plan's actual community rates in effect on January 1, 1999 and the information you provided about the plan's Similarly Sized Subscriber Groups (SSSGs). The result of this reconciliation, based on our payroll headcounts of 2,803 Self and 2,502 Family on March 31, 1999, is that your plan is due $5,461,752. This takes into account $5,680 for brochure printing costs. A copy of our calculations is enclosed.

Due to an unresolved audit issue, OPM will not be making a contingency reserve payment to you for this amount.

This letter also confirms that your 2000 biweekly net-to-carrier rates will be, as you proposed, $142.68 Self and $369.46 Family.

To be in compliance with Section 3.6 of your contract, these rates must include the enrollment discrepancy loading of one percent. Please confirm acceptance of these rates by August 6, 1999. You must confirm your rates by that date for us to meet our printing deadlines. If necessary to meet the deadline, please use an express mail service.

Send two copies of your reply, one for this office and one for Health Benefits Contract Division, to:

Ms. Nancy Kichak
Office of Actuaries
Office of Personnel Management
Room 4307
1900 E Street, NW
Washington, DC 20415

The above address is suitable for express mail.

Sincerely,

Nancy H. Kichak

Nancy H. Kichak
Director
Office of Actuaries

Enclosures

cc: Nataya Battle

ATTACHMENT II

## PROPOSED BIWEEKLY NET-TO-CARRIER RATES FOR THE 2000 RATE YEAR

CARRIER NAME: Scott & White Health Plan STATE: Texas CODE: UF

| | SELF | FAMILY | PAGE # |
|---|---|---|---|
| 1. Proposed Unadjusted Federal Group Rates for January 1, 2000<br>( x ) Estimate ( ) Actual | $112.83 | $291.72 | 1 |
| 2. Special Benefit Loadings: | | | |
| (a) Mental Health Copay (IP & OP) ✓ | 1.03✓ | 2.65 | 15 |
| (b) $10 Office Visit Copay ✓ | (1.67) | (4.32) | 16 |
| (c) $100 Per Admit Inpatient Copay ✓ | (1.51) | (3.91) | 16 |
| (d) Transitional Care Coverage | 0.28 | 0.73 | 16 |
| (e) Allergy Serum Copay ✓ | 0.05 | 0.12 | 18 |
| (f) Contraceptive Coverage ✓ | 0.71 | 1.84 | 18 |
| (g) Dental Rider ✓ | 3.11 | 9.87 | 19 |
| (h) Prescription Drug Rider ✓ | 26.32 | 64.18 | 25 |
| (i) Serious Mental Illness Rider ✓ | 0.83 | 2.14 | 34 |
| (j) Diabetic Mandated Benefits ✓ | 1.81 | 4.70 | 34 |
| (k) State Premium Tax Adjustment ✓ | (2.52) | (6.47) | 42 |
| 3. FEHBP Rates Plus Special Loadings | 141.27 | 363.25 | |
| 4. Standard Loadings | | | |
| (a) Extension of Coverage Loading Loading { .004 x (3) } | n/a | n/a | |
| (b) Medicare Loading | n/a | n/a | |
| (c) Children's Loading | n/a | 2.55 | 45 |
| 4d. Subtotal { (3) + (4a) + (4b) + (4c) } | 141.27 | 365.80 | |
| 4e. Enrollment Discrepancy Load (1%) { .01 x (4d) } | 1.41 | 3.66 | |
| 5. Proposed I 999 | $142.68 | $369.46 | |

APPROVED Date 7/29/99 Initial VRW
Date 7/30 Initial [illegible]

29-Jul-99

# Scott & White Health Plan (UF)

## 1999 Reconciliation - Attachment III

| | SELF | FAMILY |
|---|---|---|
| 1. Actual Community Rate 1/1/1999 | $103.05 | $266.42 |
| 2. Special Benefit Loadings | | |
| (a) Mental Health Inpatient and Outpatient Copa | $0.96 | $2.47 |
| (b) Allergy Serum | $0.04 | $0.11 |
| (c) Dental Rider | $2.36 | $7.49 |
| (d) Prescription Drug Rider | $16.51 | $40.27 |
| (e) Serious Mental Illness Rider | 0.78 | 2.01 |
| (f) Diabetic Mandated Benefits | $1.67 | $4.32 |
| (g) State Premium Tax Adjustment | ($2.21) | ($5.68) |
| (h) Contraceptive Coverage | 0.65 | 1.68 |
| 3. Community Rate Plus Special Loadings | $123.81 | $319.09 |
| 4. Standard Loadings | | |
| (a) Extension Of Coverage [ 0.004 * (3.) ] | | |
| (b) Children's Loading | | $2.25 |
| (c) Medicare Loading | | |
| 4d. Subtotal | $123.81 | $321.34 |
| 4e. Enrollment Discrepancies Loading (1%) | $1.24 | $3.21 |
| 5. Total = Actual Rate For 1999 | $125.05 | $324.55 |
| 6. 1999 FEHBP Contract Rate | $102.42 | $266.03 |
| 7. Difference ((5)-(6)) | $22.63 | $58.52 |
| 8. March 31, 1999 Enrollment | 2803 | 2502 |
| 9. Payment Due Plan /(FEHBP) | $1,649,229 | $3,806,843 |
| 10. Total Amount Due Plan/(FEHBP) | | $5,456,072 |
| 11. Outstanding Amount Due Plan/(FEHBP) | | $0 |
| 11a. Brochure Printing Costs | | $5,680 |
| 12. Grand Total Amount Due Plan/(FEHBP) | | $5,461,752 |

CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

| | | | |
|---|---|---|---|
| CONTRACT NO: | CS 1929 | AMENDMENT NO: | 1999-02 |
| EFFECTIVE: | January 1, 1983 | EFFECTIVE: | September 1, 1999 |

BETWEEN: THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
*hereinafter called the OPM, the Agency, or the Government*

AND

CONTRACTOR: SCOTT AND WHITE HEALTH PLAN
*hereinafter also called the Carrier*

Address: 2401 S. 31st Street
Temple, TX 76508-3000

PART I -- GENERAL PROVISIONS, is revised to add a new section at the end:

SECTION 1.__
NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT
(SEPT 1999)

(a) Enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy at the time a carrier (1) terminates all or a part of its FEHBP contract, or (2) terminates the enrollees' specialty provider contract, for reasons other than cause, may be able to continue to see their specialty provider for up to 90 days or through their postpartum care.

(b) The Carrier shall notify its enrollees in writing of its intent to terminate all or part of its FEHBP contract, including service area reductions, or the enrollees' specialty provider contract, for reasons other than cause in order to allow sufficient time for the enrollees to arrange for continued care after the 90-day period. The Carrier shall send the notice in time to ensure it is received by the enrollees no less than 90 days prior to the date it terminates the contract, unless the Carrier demonstrates it was prevented from doing so for reasons beyond its control. The Carrier's prompt notice will ensure that the notification period and the transitional care period run concurrently.

| FOR THE CARRIER | FOR THE GOVERNMENT |
|---|---|
| Henry D. Eckert | David A. Lewis |
| Name of Person Authorized to Execute Contract *(Type or print)* | Name of Contracting Officer *(Type or print)* |
| Associate Executive Director | Chief, Insurance Contracts Division IV |
| *Title* | *Title* |
| [signature] | [signature] |
| *Signature* | *Signature* |
| 9/22/99 | 10/21/99 |
| *Date Signed* | *Date Signed* |

CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

| | | | |
|---|---|---|---|
| CONTRACT NO: | CS 1929 | AMENDMENT NO: | 1999-01 |
| EFFECTIVE: | January 1, 1983 | EFFECTIVE: | January 1, 1999 |

BETWEEN: THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
*hereinafter called the OPM, the Agency, or the Government*

AND

CONTRACTOR: Scott and White Health Plan
*hereinafter also called the Carrier*

Address: SCOTT AND WHITE HEALTH PLAN
2401 S 31ST ST
TEMPLE TX 76508-3000

APPENDIX A – Brochure Text, is amended to include the following:

**The Plan offers the full range of FDA-approved drugs, prescriptions, and devices for birth control.**

The parties agree that the foregoing change supersedes any conflicting language in the Brochure Text, Appendix A. The carrier further agrees that it will not discriminate against plan providers whose individual religious beliefs or moral convictions prevent them from prescribing contraceptive methods.

| FOR THE CARRIER | FOR THE GOVERNMENT |
|---|---|
| [signature] | David A. Lewis |
| Name of Person Authorized to Execute Contract *(Type or print)* | Name of Contracting Officer *(Type or print)* |
| Executive Director | Chief, Insurance Contracts Division IV |
| *Title* | *Title* |
| Deny Radefeld | [signature] |
| *Signature* | *Signature* |
| 11/18/98 | 11/25/98 |
| *Date Signed* | *Date Signed* |

CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

CONTRACT NO: CS 1929
EFFECTIVE: 01-01-1983

AMENDMENT NO: 1999
EFFECTIVE: 01-01-1999

BETWEEN: THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT hereinafter called the OPM, the Agency or the Government

AND

CONTRACTOR: Scott and White Health Plan hereinafter also called the Carrier.

Address:
SCOTT AND WHITE HEALTH PLAN
2401 S 31ST ST
TEMPLE, TX 76508-3000

In consideration of payment by the Agency of subscription charges set forth in Appendix B, the Carrier agrees to perform all of the services set forth in this contract, including Appendix A.

FOR THE CARRIER

Deny Radefeld
Name of Signer (Typed or Printed)

Executive Director
Title of Signer

Signature of Person
Authorized to Execute Contract

September 21, 1998
Date Signed

FOR THE GOVERNMENT

David A. Lewis
Name of Contracting Officer

Chief, Insurance Contracts Division IV
Title of Contracting Officer

Signature of Contracting Officer

10/1/98
Date Signed

## 1999 Amendments to the Standard Contract for Community-Rated Carriers

1. Throughout this contract the terms Comprehensive Medical Plan or CMP have been replaced with the terms Health Maintenance Organization or HMO.

2. The Table of Contents has been revised to list new Sections and amended Section titles where required by this amendment.

3. Section 1.7, STATISTICS AND SPECIAL STUDIES, is redated JAN 1999 and paragraph (c) has been revised to indicate that the Carrier shall furnish the routine reports in the required number of copies.

4. Section 1.9, FEHB QUALITY ASSURANCE, is redated JAN 1999; paragraph (7), Appointments, is revised by changing the word "prepaid" to Health Maintenance Organization; and paragraph (e) is amended as follows:

(e) Assessing Member Services. In addition to any other means of surveying Plan members that the Carrier may develop, the carrier shall participate in either a National Committee for Quality Assurance (NCQA) Health Plan Employer Data and Information Set (HEDIS) consumer survey or an FEHB-specific consumer survey, to provide feedback to enrollees on enrollee experience with the various FEHB plans. The Carrier shall take into account the published results of the survey, or other results as directed by OPM, in identifying areas for improvement as part of the Carrier's quality assurance program. Payment of survey charges will be in accordance with Section 3.7.

5. Section 1.10, NOTICE OF SIGNIFICANT EVENTS, paragraph (d) has been revised to replace the terms "a CMP" with the terms "an HMO".

6. Section 1.13, INFORMATION AND MARKETING MATERIALS, is redated JAN 1999 and paragraph (a) is amended to reflect the requirement for an electronic brochure, as follows:

(a) OPM and the Carrier shall agree upon language setting forth the benefits, exclusions and other language of the Plan. OPM in its sole discretion, may order the Carrier to print and distribute the agreed upon brochure text in a format and quantity approved by OPM, including an electronic brochure version for OPM's World Wide Web Site. This formatted document is referred to as the FEHB brochure. The Carrier shall distribute the FEHB brochure to all Federal employees, annuitants, former spouses and former employees and dependents enrolled in the Plan. The Carrier shall also distribute the document(s) to Federal agencies to be made available to such individuals who are eligible to enroll under this contract. At the direction of OPM, the Carrier shall produce and distribute an audio cassette version of the approved language. The Carrier may print additional FEHB brochures for distribution or its own use, but only in the approved format and at its own expense.

7. A new Section 1.20, PATIENT BILL OF RIGHTS, is added to implement the recommendations in the Health Care Consumer Bill of Rights and Responsibilities, as follows:

SECTION 1.20
PATIENT BILL OF RIGHTS (JAN 1999)

(a) The Carrier shall implement the recommendations in the Health Care Consumer Bill of Rights and Responsibilities ("Patient Bill of Rights") in accordance with OPM guidance.

(b) During the Carrier's provider contract renewal process, the Carrier shall make any necessary modifications to such provider contracts to comply with the recommendations of the Patient Bill of Rights in accordance with OPM guidance. All new provider contracts with the Carrier shall comply with the recommendations of the