SCOTT & WHITE
HEALTH PLAN

September 7, 1999

Frank D. Titus
Assistant Director for Insurance Programs
Office of Insurance Programs
Office of Personnel Management
1900 E Street, N.W., Room 3424
Washington, D.C. 20415

Re: **Contract No. CS 1929, Set-off of $5,461,752**

**Certified Mail #Z 186 672 073**

Dear Mr. Titus:

I am writing to request that OPM release the funds due Scott and White Health Plan ("SWHP") for the 1999 rate reconciliation that are being withheld pending resolution of the findings and recommendation set forth in Final Audit Report No. UF-00-97-001. OPM's decision to withhold the $5,461,752 was communicated to SWHP in a July 30, 1999 letter from Nancy Kichak, Director of OPM's Office of the Actuaries.

As noted in SWHP's June 30, 1999 response to the final audit report, SWHP disputes several of the report's findings and recommendations. To date, OPM has not responded to SWHP's response to the final audit report nor has the OPM Contracting Officer issued a final decision on the audit. Therefore, SWHP believes that OPM's decision to withhold the reconciliation amounts due SWHP is unwarranted.

The Federal Acquisition Regulation ("FAR") provides a process whereby collection of a debt may be deferred to prevent over-collection. Pursuant to FAR 32.613, SWHP hereby requests that OPM enter into a deferment agreement and OPM remit the withheld amount to SWHP. In accordance with FAR 32.613(c), the following information is being submitted with SWHP's request for a deferment agreement:

1. **Financial condition.** Attached is a copy of SWHP's most recent certified financial report.

2. **Contract backlog.** SWHP is not aware of any backlog under SWHP's contract with OPM.



2401 South 31st Street
Temple, Texas 76508
(254) 298-3000
(800) 321-7947

3000 Briarcrest, Suite 422
Bryan, Texas 77802
(409) 268-7947
(800) 791-8777

American Plaza
200 W. Highway 6, Suite 101
Waco, Texas 76712
(254) 776-5468
(800) 684-7947

Old Town Square
One Chisholm Trail, Suite 200
Round Rock, Texas 78681
(512) 310-3012
(800) 758-3012

08/16/02 FRI 14:41 FAX 202 606 0140 AUDIT RESOLUTION 003
Received: 8/16/02 13:48; 202 606 0140 -> OPM; Page 3

3. **Projected cash receipts and requirements.** Cash receipts projected through 12/31/99 are $258,392,000 and cash requirements are estimated at $260,681,000.

4. **The feasibility of immediate payment of the debt.** Note that the adjustment recommended in the final audit report is merely a recommendation from the auditors and has not been accepted by the Contracting Officer. Moreover, SWHP disputes the amount of the recommended adjustment, and will likely appeal an agency final decision that would require SWHP to return the disputed amounts. SWHP will require the cash from this debt in order to meet provider payment obligations arising shortly after year end.

5. **The probable effect on operations of immediate payment in full.** SWHP will require cash in order to meet contractual provider obligations shortly after year end.

SWHP is prepared to include in a deferment agreement appropriate covenants and securities to assure OPM of repayment of the amount determined to be due OPM as a result of the audit. If a deferment agreement is acceptable to OPM, we will submit a proposed agreement for OPM's consideration.

Your prompt response to this request would be appreciated.

Sincerely,

Dave Morehead, M.D.
President



08/16/02 FRI 14:41 FAX 202 606 0140 AUDIT RESOLUTION 004
Received: 8/16/02 13:49; 202 606 0140 -> OPM; Page 4

Scott and White Health Plan
2401 S. 31St Street Temple, Texas 76508 (254)298-3011 Fax (254)298-3034 Voice

# TELEFAX

From Henry D. Eckert

To: Mr. David Lewis and Mrs. Nataya Battle
Subject: Our Decision to Withdraw from the FEHBP Effective January 1, 2000
Date: September 22, 1999

Dear David and Nataya

As we discussed this afternoon, Scott and White regrets that we have decided to withdraw from participation as an HMO under the FEHBP effective upon the contract anniversary date for 2000. We have struggled with this decision for the past many weeks and have concluded, after seeing our final rates, that we are in an adverse selection spiral and are no longer competitive. We have been with the FEHBP since almost the beginning of our HMO and this is a real difficult decision for us. We are concerned about our members and about the many fine people with whom we have worked at OPM for the past many years, you two included. Our clinic and hospital have decided to become part of the PPO network under the Mail Handlers program, so, hopefully, we can continue to serve our federal members is this way. Thank you for working with us. We will miss you and the program.

Sincerely

H. D. Eckert

Henry D. Eckert
Associate Executive Director

Yellow

United States
**Office of**
**Personnel Management**

Washington, D.C. 20415

SEP 23 1999

In Reply Refer To: Your Reference:

HENRY ECKERT
ASSOCIATE EXECUTIVE DIRECTOR
SCOTT & WHITE HEALTH PLAN
2401 S 31ST STREET
TEMPLE TX 76508-3000

Dear Mr.Eckert:

This is in response to your letter dated September 22,1999, notifying the Office of Personnel Management (OPM) that Scott & White Health Plan will not be renewing its contract for 2000. The Plan will, therefore, withdraw from participation in the Federal Employees Health Benefits Program (FEHBP) at the end of the 1999 contract year.

Please notify all Federal enrollees of the Plan's termination in the FEHBP by sending them a copy of the enclosed notice printed on the Plan's letterhead stationery. This notice must be mailed by October 1, 1999. Once the notice has been mailed, please send us a copy of the Plan's notice.

We want to remind you that it is the Plan's responsibility to continue to provide benefits to all Federal enrollees until coverage under their new health benefits plan begins. 5 CFR Section 890.201 (a)(9) states, "To be qualified to be approved by OPM, a health benefits plan shall...Provide for continued enrollment to the end of the current pay period of each employee and annuitant enrolled at the effective date of termination of a contract. The carrier is entitled to subscription charges for this continued enrollment." Accordingly, the Plan is responsible for continuing coverage until each Federal enrollee's effective date of new enrollment, which is reflected on an automated listing or on the Plan's copy of the enrollee's new SF 2809, Health Benefits Registration Form.

In addition, we are reminding you that a voluntary termination from the FEHBP will have no adverse impact on any future application that Scott & White may wish to make. Applications are reviewed once a year and are considered based on the information provided at that time. The filing deadline is January 31. If the Plan's application is approved, participation in the FEHBP begins the following January.

It has been a pleasure to work with you and we look forward to and very much appreciate, your cooperation.

Sincerely,

D. Lewis 9.23.99

David A. Lewis, Chief
Insurance Contracts Division IV
Office of Insurance Programs
Contracting Officer

Enclosure

M. Battle 9-22-99

**TO FEDERAL ENROLLEES OF**

**SCOTT & WHITE HEALTH PLAN**

Scott & White Health Plan (enrollment codes UF1 and UF2) will not be offered through the Federal Employees Health Benefits (FEHB) Program in 2000.

**Transitional Care Under the Patients' Bill of Rights**

This plan will stop participating in the FEHB Program effective December 31, 1999. If you have read about the Patients' Bill of Rights, you may know that enrollees under the FEHB Program who are seeing a specialist for a chronic or disabling condition or who are in the second or third trimester of a pregnancy have a right of up to 90 days of continued treatment (or treatment through the end of post-partum care) following notice that a plan is leaving the FEHB Program.

This notice is being sent to you more than 90 days in advance so that you have sufficient time to make arrangements for continued care.

**To continue to receive benefits under the FEHB Program, you must transfer to another participating health plan during the upcoming Open Season, November 8, 1999 through December 13, 1999.**

If you are an employee, you should contact your personnel office and enroll in a new health plan no later than December 13, 1999. **If you do not enroll by that date, you will not have any health benefits coverage for 2000.** The effective date of the new coverage will generally be the first day of the first pay period beginning on or after January 1, 2000. The new premium will be effective the first full pay period in 2000. For Postal employees the date a premium change is effective will usually be January 1, 2000, and for non-Postal employees the date will usually be January 2, 2000.

If you are retired, your retirement system will send you a package of Open Season material to help you select a different health plan. This package will contain information on requesting brochures for those plans in which you are interested and also on changing your enrollment to a new health plan. **You must select a new health plan during the Open Season. If your selection is not received by the end of Open Season, current regulations provide that you will be deemed to have elected Standard Option coverage under the government-wide Blue Cross and Blue Shield Service Benefit Plan. All annuitant changes will become effective January 1, 2000.**

If you are a Civil Service Retirement System (CSRS) or Federal Employees Retirement System (FERS) retiree and need additional information or if you did not receive an open season package, you should call Open Season Express at 1-800-332-9798 or access Open Season Online at {http://www.opm.gov/retire/fehb}. For the hearing impaired, the Retirement Information Office has a toll-free TDD number you may use for assistance (1-800/878-5707). If you do not have a telephone, you can write to the Open Season Processing Center at P.O. Box 4198, Iowa City, IA 52244-4198. Please include your annuity claim number in any correspondence you send to the Open Season Processing Center. *If you are a retiree of another Federal retirement system, you must contact that system for assistance.*

**Please remember you must choose a new health plan during the 1999 Open Season. Employees must submit a completed enrollment form no later than December 13, 1999. If you are an employee and you do not return an enrollment form, you will not have health benefits coverage for 2000. CSRS and FERS retirees should call Open Season Express at 1-800-332-9798 to make their Open Season enrollment changes.**

Thank you for your cooperation in this matter.

SCOTT & WHITE HEALTH PLAN

October 10, 2000

*By Hand Delivery*

David Lewis
Contracting Officer
Insurance Contracts Division IV
Office of Personnel Management
1900 E Street, N.W., Room 3424
Washington, D.C. 20415

Re: *Certified Claim Under FEHBP Contract Number CS1929.*

Dear Mr. Lewis:

Scott & White Health Plan ("SWHP") hereby submits this claim under contract CS1929 (the "Contract") with the Office of Personnel Management ("OPM") under the Federal Employees Health Benefits Program ("FEHBP"). The claim is certified in accordance with the Contract Disputes Act ("CDA"). The claim seeks to recover $3,625,782 (the "Claim Amount") in unpaid premiums for the 1999 contract year. Specifically, SWHP requests payment for premiums owed by OPM under the Contract for benefits and coverage provided by SWHP to FEHBP members for the 1999 contract but which OPM did not pay to SWHP.

OPM did not pay the Claims Amount on the ground that SWHP terminated the Contract at the end of the 1999 contract year and therefore was not entitled to a rate reconciliation adjustment. It is SWHP's understanding that OPM relied upon 48 C.F.R. § 1652.216-70(b)(6) in denying SWHP payment of the Claim Amount. Section 1652.216-70(b)(6) provides as follows:

> In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to the reconciliation and the actual subscription rates.

SWHP objects to OPM's refusal to pay the Claim Amount for several reasons. First, OPM contracted with SWHP for the 1999 contract year to pay a rate that was equivalent to the subscription rates that SWHP gave to its similarly sized subscriber groups ("SSSGs"). See 48 C.F.R. § 1652.216-70(B)(2). Pursuant to the 1999 rate reconciliation that SWHP submitted to OPM on May 21, 1999, SWHP revised its 1999 FEHBP rates to be equivalent to the subscription

rates that SWHP charged its two SSSGs. This resulted in an increase of the FEHBP's 1999 rates by the Claim Amount. By not paying the Claim Amount, OPM has refused to pay SWHP the rates that OPM is obligated to pay under the Contract. OPM acknowledged the adjustment due SWHP for the 1999 rate reconciliation in a letter dated July 30, 1999 to SWHP. See attached.

Second, SWHP has written confirmation from OPM that the agency has not consistently applied 48 C.F.R. § 1652.216-70(b)(6) and has, in fact, permitted rate reconciliation adjustments for the FEHBP contractors' last year in the program. OPM's inconsistent application of section 1652.216-70(b)(6) is unfair to SWHP, which incurred substantial losses under the Contract.

In light of the foregoing, OPM should take immediate steps to pay SWHP the Claim Amount and interest that may become due or accrue under the CDA and the Prompt Payment Act. The Plan requests that OPM respond to this claim within sixty days with a final decision.

The undersigned certifies this claim as follows:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Respectfully submitted,

Henry D. Eckert
Executive Director

cc: Christine C. Rinn, Esquire
McDermott, Will & Emery

**EXHIBIT A**

Copy Ross
Michelle

rcvd 8/10
postmarked 8/3

United States
**Office of**
**Personnel Management**

JUL 30 1999

Washington, D.C. 20415-0001

In Reply Refer To: Your Reference:

Ms. Michelle Delegram
Scott and White
22401 South 31st Street
Temple, TX 76508

Dear Ms. Delegram:

This letter concerns Scott and White (Code UF)'s 2000 rates for the Federal group and represents conclusions reached by you with Jared Wessel of this office.

We have calculated the difference between the 1999 contract rates and the rates that should be charged based on your plan's actual community rates in effect on January 1, 1999 and the information you provided about the plan's Similarly Sized Subscriber Groups (SSSGs). The result of this reconciliation, based on our payroll headcounts of 2,803 Self and 2,502 Family on March 31, 1999, is that your plan is due $5,461,752. This takes into account $5,680 for brochure printing costs. A copy of our calculations is enclosed.

Due to an unresolved audit issue, OPM will not be making a contingency reserve payment to you for this amount.

This letter also confirms that your 2000 biweekly net-to-carrier rates will be, as you proposed, $142.68 Self and $369.46 Family.

To be in compliance with Section 3.6 of your contract, these rates must include the enrollment discrepancy loading of one percent. Please confirm acceptance of these rates by August 6, 1999. You must confirm your rates by that date for us to meet our printing deadlines. If necessary to meet the deadline, please use an express mail service.

Send two copies of your reply, one for this office and one for Health Benefits Contract Division, to:

Ms. Nancy Kichak
Office of Actuaries
Office of Personnel Management
Room 4307
1900 E Street, NW
Washington, DC 20415

The above address is suitable for express mail.

Sincerely,

Nancy H. Kichak

Nancy H. Kichak
Director
Office of Actuaries

Enclosures

cc: Nataya Battle

# ATTACHMENT II

## PROPOSED BIWEEKLY NET-TO-CARRIER RATES
## FOR THE 2000 RATE YEAR

CARRIER NAME: Scott & White Health Plan STATE: Texas CODE: UF

| | SELF | FAMILY | PAGE # |
|---|---|---|---|
| 1. Proposed Unadjusted Federal Group Rates for January 1, 2000 | $112.83 | $291.72 | 1 |
| ( x ) Estimate ( ) Actual | | | |
| 2. Special Benefit Loadings: | | | |
| (a) Mental Health Copay (IP & OP) ✓ | 1.03 | 2.65 | 15 |
| (b) $10 Office Visit Copay ✓ | (1.67) | (4.32) | 16 |
| (c) $100 Per Admit Inpatient Copay ✓ | (1.51) | (3.91) | 16 |
| ? (d) Transitional Care Coverage | 0.28 | 0.73 | 16 |
| (e) Allergy Serum Copay ✓ | 0.05 | 0.12 | 18 |
| (f) Contraceptive Coverage ✓ | 0.71 | 1.84 | 18 |
| (g) Dental Rider ✓ | 3.11 | 9.87 | 19 |
| (h) Prescription Drug Rider ✓ | 26.32 | 64.18 | 25 |
| (i) Serious Mental Illness Rider ✓ | 0.83 | 2.14 | 34 |
| (j) Diabetic Mandated Benefits ✓ | 1.81 | 4.70 | 34 |
| (k) State Premium Tax Adjustment ✓ | (2.52) | (6.47) | 42 |
| 3. FEHBP Rates Plus Special Loadings | 141.27 | 363.25 | |
| 4. Standard Loadings | | | |
| (a) Extension of Coverage Loading-- Loading { .004 x (3) } APPROVED | n/a | n/a | |
| (b) Medicare Loading — Date 7/29/99 Initial JRW | n/a | n/a | |
| (c) Children's Loading — Date 7/30 Initial | n/a | 2.55 | 45 |
| 4d. Subtotal { (3) + (4a) + (4b) + (4c) } | 141.27 | 365.80 | |
| 4e. Enrollment Discrepancy Load (1%) { .01 x (4d) } | 1.41 | 3.66 | |
| 5. Proposed I 999 | $142.68 | $369.46 | |

29-Jul-99

# Scott & White Health Plan (UF)

## 1999 Reconciliation - Attachment III

| | SELF | FAMILY |
|---|---|---|
| 1. Actual Community Rate 1/1/1999 | $103.05 | $266.42 |
| 2. Special Benefit Loadings | | |
| (a) Mental Health Inpatient and Outpatient Copa | $0.96 | $2.47 |
| (b) Allergy Serum | $0.04 | $0.11 |
| (c) Dental Rider | $2.36 | $7.49 |
| (d) Prescription Drug Rider | $16.51 | $40.27 |
| (e) Serious Mental Illness Rider | 0.78 | 2.01 |
| (f) Diabetic Mandated Benefits | $1.67 | $4.32 |
| (g) State Premium Tax Adjustment | ($2.21) | ($5.68) |
| (h) Contraceptive Coverage | 0.65 | 1.68 |
| 3. Community Rate Plus Special Loadings | $123.81 | $319.09 |
| 4. Standard Loadings | | |
| (a) Extension Of Coverage [ 0.004 * (3.) ] | | $2.25 |
| (b) Children's Loading | | |
| (c) Medicare Loading | | |
| 4d. Subtotal | $123.81 | $321.34 |
| 4e. Enrollment Discrepancies Loading (1%) | $1.24 | $3.21 |
| 5. Total = Actual Rate For 1999 | $125.05 | $324.55 |
| 6. 1999 FEHBP Contract Rate | $102.42 | $266.03 |
| 7. Difference ((5)-(6)) | $22.63 | $58.52 |
| 8. March 31, 1999 Enrollment | 2803 | 2502 |
| 9. Payment Due Plan /(FEHBP) | $1,649,229 | $3,806,843 |
| 10. Total Amount Due Plan/(FEHBP) | | $5,456,072 |
| 11. Outstanding Amount Due Plan/(FEHBP) | | $0 |
| 11a. Brochure Printing Costs | | $5,680 |
| 12. Grand Total Amount Due Plan/(FEHBP) | | $5,461,752 |

# EXHIBIT B

## OPM Reconciliation Guidelines - 1999

**Note: Please pay particular attention to statements below that are in bold-faced type. Such statements usually contain significant information.**

Note: Beginning with the 1997 reconciliation instructions, we began using the word "carrier" (instead of the previously used "plan") to mean the entity contracting with OPM. This conforms more closely with the definitions in the FEHBP law, which defines "carrier" as the organization that offers a policy or contract (benefits package) and a health benefits "plan" as the policy/contract.

**Policy On Rate Reconciliation Audits (RRAs)**

Each year the Office of Inspector General (OIG) audits the rate reconciliations of a limited number of carriers. The Office of Actuaries (OA) uses these audit results in setting the final rates. The OIG will conduct no subsequent audits of that year's rates.

Once the rates are finalized, however, OPM will permit no changes to the rates, and will accept no new or additional information from the carrier intended to change the audit results or final rates. The OIG's auditor will inform the carrier of the audit results before the rates are finalized, and the OA will discuss the results with the carrier. **Therefore, it is the carrier's responsibility to inform the OA of any disagreement it has with the audit results and/or final rates before the OA finalizes the rates.**

The only condition under which rates finalized in conjunction with an RRA will be changed is when these rates are affected by a subsequent audit performed on previous contract years.

**Policy On Error Reporting**

If a carrier discovers that a previous rate proposal and/or reconciliation submitted to OPM is incorrect (e.g., through the discovery of an error or omission), the carrier **must**

1) Notify OPM

2) Prepare and submit to OPM an amended proposal and/or reconciliation (including a newly executed Certificate Of Accurate Pricing).

**Note: The above policy does not apply to proposals and/or reconciliations that have already been audited by OPM's audit**

**staff and resolved by OPM's Office of Insurance Programs (OIP). That is, after an audit resolution by OIP, the results are final.**

Similarly-Sized Subscriber Groups (SSSGs)

The reconciliation requests information on your carrier's Similarly Sized Subscriber Groups (SSSGs). At the time of your 1999 proposal, our regulation, 48 CFR 1602.170-13, defined SSSGs as follows:

(a) Similarly sized subscriber groups (SSSGs) are a comprehensive medical plan's two employer groups that:

(1) As of the date specified by OPM in the rate instructions, have a subscriber enrollment closest to the FEHBP subscriber enrollment; and

(2) Use any rating method other than retrospective experience rating; and

(3) Meet the criteria specified in the rate instructions issued by OPM.

**Note: "subscriber enrollment" refers to contract enrollment. This could be the total self and family contract enrollment, or the total self, couples, and family contract enrollment, or some other sum, depending of the rate structure of the group.**

(b) Any group with which an FEHB carrier enters into an agreement to provide health care services is a potential SSSG (including separate lines of business, government entities, groups that have multi-year contracts, and groups having point of service products).

The regulation points out in paragraph (c) that there are certain exceptions to the rule in paragraph (b). That is, the following groups must be excluded from consideration:

(1) Groups the carrier rates by the method of retrospective experience rating.

(2) Groups consisting of the carrier's own employees.

(3) Medicaid groups, Medicare groups, and groups that have only a stand-alone benefit (such as dental only).

**OPM Reconciliation Guidelines - 1999**

(4) A purchasing alliance whose rate-setting is mandated by the State or local government.

Finally, the regulation states the following pertaining to how OPM will determine the Federal group's rate in relation to the SSSG rates:

(d) OPM shall determine the FEHBP rate by selecting the lower of the two rates derived by using the two rating methods consistent with those used to derive the SSSG rates.

For the 1999 rate year, the specific guidelines for SSSGs are as follows:

(1) All group enrollments (the Federal group and the SSSG enrollments) should be the latest 1999 enrollment available to the carrier (but no later than March 31, 1999).

(2) The contract renewal date for 1999 SSSGs should be between July 2, 1998 and July 1, 1999. **Note: You should interpret "renewal date" to mean the date on which a rate change (if any) is effective for the SSSG.**

Note: We stated these guidelines in the 1999 rate instructions.

**Note: If an SSSG's rate is extended beyond twelve months (i.e. the carrier allows an SSSG to change its renewal date), a premium adjustment must be made for the SSSG in the following year, or the OPM audit staff may interpret the rate extension as a discount.**

**Note: Recently, some carriers have asked if new groups are eligible to be SSSGs. They are.**

We developed the SSSG concept to ensure that OPM receives an equitable and reasonable market-based rate. For the 1999 rate year, OPM will focus on the rating methods used for the two SSSGs to determine if the carrier appropriately derived the Federal group rates.

## OPM Reconciliation Guidelines - 1999

OPM requires the Federal group rates to be equivalent to the rates for the SSSGs. Therefore, we expect the Federal group to receive the largest rate discount given to an SSSG and any other advantages given to the SSSGs. For example, if the carrier gives an early rate quote (based on a lower community rate than the rates later quoted other groups) to an SSSG and does not revise it at a later date, we will interpret the SSSG rate as a discounted rate, and require a similar rate discount for the Federal group. **As another example, if the carrier rates an SSSG using a rating method not in accord with carrier-established policies, the Federal group is entitled to any rate reduction produced by applying the SSSG rating method to the Federal group.**

The OPM audit staff may examine the rates and benefit loadings of non-SSSG groups. The purpose of such analysis is to make certain the Federal group rates are fair in relation to the SSSG rates. For example, if an SSSG had a special benefit not included in the Federal group benefit package, OPM would compare what the carrier charged the SSSG with what it charged other groups for this benefit. The purpose would be to verify that the SSSG received no discount.

All rate agreements between OPM and the carrier are subject to audits by the OPM Office of the Inspector General. The results of such audits may require modifications to previous agreements and subsequent rate adjustment. **Pursuant to contract clause 3.4, Contractor Records Retention (FEHBAR 1652.204-70), OPM requires all carriers to maintain documentation to support all calculations and statements pertaining to this reconciliation. This includes documentation to support the SSSG rates. And, for carriers using an ACR method, this includes detailed reports supporting all data (e.g., claims data) used to derive the rates.**

OPM will review the carrier's SSSGs to verify that the carrier is in compliance with OPM rating principles. Compliance now includes Federal group rate adjustments based on the carrier's treatment of its SSSGs.

### Special Loading For Enrollment Discrepancies

Beginning with contract year 1997, as the result of negotiations between OPM and representatives of community-rated carriers, we amended the Standard Contract for Federal Employees Health Benefits. The contract now provides for a special premium loading of 1% to account for enrollment discrepancies. **Note: The carrier must explicitly take this loading, but may eliminate its**

effect by also giving the Federal group a 1% discount. The carrier should keep in mind that the its contract with the FEHBP states in Section 3.6(b) " the Carrier accepts the adjustment to the subscription charges in full resolution of all obligations of the Government in connection with the subscription payments as described in this section 3.6 and waives any rights it may have to claims for subscription payments under Section 3.1(a)."

**Multiple Rating Areas**

As we explained in the 1999 rate instructions, beginning with the 1999 rate year, **we have amended our policy with regard to multiple rating areas.** We now require that both SSSGs be chosen only from groups that have enrollees in the federal group's region.

Normally, a carrier must choose two SSSGs for every federal group having a unique rate code. It is possible that a carrier could have several different geographical regions of federal enrollees under the same rate code. It is even possible that these regions could be in different states.

Our SSSG policy with regard to federal groups in different regions under the same rate code is as follows:

(a) Those federal groups in the same state or in the same metropolitan area must be combined and the carrier must choose two SSSGs for the combined federal group.

(b) Those federal groups in different states (but not in the same metropolitan area) must be combined **in each state,** and the carrier must choose two SSSGs for the combined federal groups in each state.

The following examples illustrate the above policies.

**Example 1**

A carrier operates only in the state of Texas. It serves federal enrollees in three distinct geographical areas, Dallas, Houston and San Antonio. Each region has it's own rate code.

The carrier must choose two SSSGs for each region. Those for each region would come from groups the carrier does business with having enrollees in that region.

# OPM Reconciliation Guidelines - 1999

**Example 2**

Same situation as in Example 1 except that one rate code applies to all three regions, meaning that the same rate applies for all federal enrollees throughout the three regions.

In this case, the carrier must combine the Federal enrollment for all three regions, and choose two SSSGs for the combined group.

**Example 3**

A carrier operates in two states, Texas and Arizona. In Texas it serves federal enrollees in Dallas, Houston, and San Antonio. In Arizona, it serves federal enrollees in Phoenix, Tucson, and Tombstone. One rate code applies to all six regions.

In this case two SSSGs are required for the combined Dallas, Houston and San Antonio regions. Two SSSGs are also required for the combined Phoenix, Tucson and Tombstone regions.

**Note: The point of Example 3 is to illustrate that only regions within a state should be combined.**

The same principle applies if the carrier operates in several states.

**Example 4**

A carrier operates in two states, and serves a metropolitan area that is in both states. The rate code is the same for all enrollees in the metropolitan area.

In this case, two SSSGs are required for the combined metropolitan region enrollment.

**Note: The point of Example 4 is to illustrate the exceptional case where regions in different states should be combined for SSSG purposes.**

**Example 5**

The size of the federal group in a region is 1700, and the carrier concludes that it must choose two SSSGs for this group. The carrier contracts with the statewide XYZ corporation, which has a statewide enrollment of 1500 with the carrier, with 100 of the enrollees living in the same region where the federal group is located.

## OPM Reconciliation Guidelines - 1999

The XYZ corporation would be a candidate for an SSSG since it has 100 enrollees in the federal group's region. The enrollment the carrier should use in comparing the size of this group to the federal group is the statewide enrollment of 1500.

**Note: The point of Example 5 is to illustrate that a group having only part of its enrollment in the federal group's region can be an SSSG. It is assumed that the rates for all 1500 enrollees of the SSSG are the same.**

**State Taxes**

5 U.S.C 8909(f)(1) prohibits the imposition of taxes, fees, or other monetary payment, directly or indirectly, on FEHBP premiums by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority of those entities. If your 1999 rates include an amount to recover such monies from the FEHBP, make an adjustment for this amount in the reconciliation in the form of a negative special benefit loading.

**Small Carrier Contingency Reserve Payments**

A small carrier whose rates were reduced by the Office of Actuaries to generate a contingency reserve payment need not request this payment. OPM will automatically make this payment during the summer of 1999.

United States
**Office of**
**Personnel Management** Washington, D.C. 20415

In Reply Refer To: Your Reference:

Dave Morehead, M.D.
President
Scott & White Health Plan
2401 South 31st Street
Temple, Texas 76508

OCT 28 1999

Dear Dr. Morehead:

I am writing in response to your request that the Office of Personnel Management (OPM) release the $5,461,752 due Scott and White Health Plan for the 1999 rate reconciliation.

As discussed in a meeting on October 21, 1999, between members of our respective staffs, OPM is denying the Plan's request. Our position is based on a program decision to withhold payments when large sums of money are owed to the OPM. A total of $5,572,346 in audit findings is outstanding. Therefore, we have determined that this is a counter balance debt and until a decision is reached on the audit issues, we will not release the funds to you.

Should you or members of your staff have questions concerning this issue, please contact Mary Saunders at (202) 606-0745.

Sincerely,

Frank D. Titus
Assistant Director
for Insurance Programs

cc: David Lewis, Chief
Insurance Contracts Division IV

bcc: Office of the Inspector General

Office of the Actuaries

United States
**Office of Personnel Management** Washington, D.C. 20415

In Reply Refer To: Your Reference:

Dave Morehead, M.D.
President
Scott & White Health Plan
2401 South 31st Street
Temple, Texas 76508

OCT 28 1999

Dear Dr. Morehead:

I am writing in response to your request that the Office of Personnel Management (OPM) release the $5,461,752 due Scott and White Health Plan for the 1999 rate reconciliation.

As discussed in a meeting on October 21, 1999, between members of our respective staffs, OPM is denying the Plan's request. Our position is based on a program decision to withhold payments when large sums of money are owed to the OPM. A total of $5,572,346 in audit findings is outstanding. Therefore, we have determined that this is a counter balance debt and until a decision is reached on the audit issues, we will not release the funds to you.

Should you or members of your staff have questions concerning this issue, please contact Mary Saunders at (202) 606-0745.

Sincerely,

[signature]

Frank D. Titus
Assistant Director
for Insurance Programs

cc: David Lewis, Chief
Insurance Contracts Division IV

4263 4867 0636

bcc: Office of the Inspector General

Office of the Actuaries

mfs|g:\common\ard\CRLtr 10\25\99

Saunders 10/26/99

262

United States
**Office of**
**Personnel Management**

Yellow

Washington, D.C. 20415

SEP 23 1999

In Reply Refer To: Your Reference:

HENRY ECKERT
ASSOCIATE EXECUTIVE DIRECTOR
SCOTT & WHITE HEALTH PLAN
2401 S 31ST STREET
TEMPLE TX 76508-3000

Dear Mr.Eckert:

This is in response to your letter dated September 22,1999, notifying the Office of Personnel Management (OPM) that Scott & White Health Plan will not be renewing its contract for 2000. The Plan will, therefore, withdraw from participation in the Federal Employees Health Benefits Program (FEHBP) at the end of the 1999 contract year.

Please notify all Federal enrollees of the Plan's termination in the FEHBP by sending them a copy of the enclosed notice printed on the Plan's letterhead stationery. This notice must be mailed by October 1, 1999. Once the notice has been mailed, please send us a copy of the Plan's notice.

We want to remind you that it is the Plan's responsibility to continue to provide benefits to all Federal enrollees until coverage under their new health benefits plan begins. 5 CFR Section 890.201 (a)(9) states, "To be qualified to be approved by OPM, a health benefits plan shall...Provide for continued enrollment to the end of the current pay period of each employee and annuitant enrolled at the effective date of termination of a contract. The carrier is entitled to subscription charges for this continued enrollment." Accordingly, the Plan is responsible for continuing coverage until each Federal enrollee's effective date of new enrollment, which is reflected on an automated listing or on the Plan's copy of the enrollee's new SF 2809, Health Benefits Registration Form.

In addition, we are reminding you that a voluntary termination from the FEHBP will have no adverse impact on any future application that Scott & White may wish to make. Applications are reviewed once a year and are considered based on the information provided at that time. The filing deadline is January 31. If the Plan's application is approved, participation in the FEHBP begins the following January.